### STATE v. LANGLEY

(No. 2058; December 5, 1938; 84 Pac. (2d) 767)

For the plaintiff, there was a brief by *Ray E. Lee,* Attorney General; *Thomas F. Shea,* Deputy Attorney General; *Wm. C. Snow,* Assistant Attorney General; and *Edward T. Lazear,* all of Cheyenne, and oral argument by *Messrs. Lee* and *Lazear.*

For the defendant, there was a brief and oral argument by *C. A. Lathrop* of Cheyenne.

BLUME, Chief Justice.

An information was filed against the defendant in this case for unlawfully selling some merchandise at less than cost in violation of Section 2 of Chapter 73, Session Laws of Wyoming of 1937, which reads as follows:

"It shall be unlawful for any person, partnership, firm, corporation, joint stock company, or other association engaged in business within this State, to sell, offer for sale or advertise for sale any article or product, at less than the cost thereof to such vendor, or give, offer to give or advertise the intent to give away any article or product for the purpose of injuring competitors and destroying competition.

"The term cost as applied to production is hereby defined as including the cost of raw materials, labor and all overhead expenses of the producer; and as applied to distribution, cost shall mean the invoice or replacement cost, whichever is lower, of the article or product to the distributor and vendor plus the cost of doing business by said distributor and vendor.

"The cost of doing business or overhead expense is defined as all costs of doing business incurred in the

conduct of such business and must include without limitation the following items of expense: labor, including salaries of executives and officers, rent, legal rate of interest on capital, depreciation, selling cost, maintenance of equipment, delivery costs, credit losses, all types of licenses, taxes, insurance and advertising."

Section 5 of the Act excepts from its provisions (a) merchandise sold in liquidation, (b) sales of perishable merchandise and seasonal goods, (c) damaged merchandise or merchandise deteriorated in quality sold as such, (d) merchandise sold under order of court, (e) merchandise sold in meeting the legal prices of a competitor. Section 12 of the Act provides as follows:

"The Legislature declares that the purpose of this Act is to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition, by prohibiting unfair and discriminatory practices by which fair and honest competition is destroyed or prevented. This Act shall be literally construed that its beneficial purposes may be subserved."

The defendant entered a plea of guilty and thereafter filed a motion in arrest of judgment, claiming that the statute is unconstitutional as hereinafter mentioned. Thereupon, the court certified to us certain difficult constitutional questions, namely, whether Section 2, supra, is in violation of the 14th amendment of the Constitution of the United States, which provides: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty or property without due process of law," or in violation of Section 6 of Article 1 of the Constitution of Wyoming, which provides: "No person shall be deprived of life, liberty or property without due process of law," or in violation of Section 7 of Article 1 of the Constitution of Wyoming, which provides that "absolute arbitrary power over the lives,

liberty or property of freemen exists nowhere in a republic, not even in the largest majority."

■ The legislation now before us would probably not cause more than ordinary anxiety, or deserve greater consideration than the ordinary constitutional question, were it not for the times in which we live, the depression now existing, the unrest now prevailing, the mass of social legislation in the last few years, the wonder whither we are going, and the frequent queries whether courts are drifting merely with the tide or are rendering their decisions with that steadfast judgment as is their wont. Before discussing the direct questions involved herein, it may be well, even though resulting in the statement of seeming platitudes, to cast a hasty glance over the basic historic facts underlying constitutional law, and the fundamental principles which should govern it; also to make a brief analysis of judicial utterances in that connection, and give our own appraisal thereof. That will perhaps dissipate uncertainties and wavering doubts, lending us self-certitude in the correctness of our decision, and, we hope, affirm the faith and confidence hitherto placed in us by our fellow-men.

The Bill of Rights contained in the various constitutions, including our own, has its direct root in the ideas of the preceding centuries. Prior to the Renaissance prices of merchandise were freely regulated. It was not deemed improper to do so even in our colonies, including New York, New Jersey, Maryland and New Hampshire as late as the time of the Revolution. 28 Columbia Law Review 712, note. With the Renaissance began a new period in human history. Thoughts of liberty and freedom took possession of the minds of men, first in the field of religion, then of politics, later in the field of economics. It came to be a part of the legal philosophy of the times that each man has, as such, and because he is a human being, certain natural,

inherent and indefeasible rights of which no government should, or has the right, to deprive him. One of the chief exponents of that doctrine was Rousseaux, writing in his Contrat Social in the eighteenth century. See Leon Duguit in 31 Harvard Law Review 1-185. That doctrine was embodied in the Declaration of Rights of the French National Assembly of 1789 in which it is stated that the end of all union of men in society is the conservation of their natural and indefeasible rights of man, and in the French Constitution of 1791, which states that the legislative power cannot make any laws which infringe and interfere with these rights. Idem, 12, 17. The Contrat Social of Rousseaux had its repercussions and its influence upon all modern doctrine of legal and political philosophy and Duguit states that "the principle of sovereignty limited by the rights of the individual is still dominant in French classical doctrine." Idem 114. Its influence in our own country during the 18th century may be noted in the writings of a contemporary. "The end of all political associations," writes Paine in his "Rights of Man" (Conclusion Part 1) "is the preservation of the natural and imprescriptible rights of man, and these rights are liberty, property, security and resistance of oppression." Liberty of production and exchange was proclaimed no less than political liberty. The "Wealth of Nations" of Adam Smith, e. g. wielded an enormous influence. To illustrate, Thomas Paine, in his work already mentioned, writes that "government is no farther necessary than to supply the few cases to which society and civilization are not conveniently competent * * *. The more perfect civilization is, the less occasion has it for government, because the more does it regulate its own affairs, and govern itself * * *. It is but few general laws that civilized life requires." Part 2, c. 1. That theory was naturally accentuated by reason of the existence and the development of our frontier,

and the spirit engendered by that development has not lost all of its influence at the present time. The doctrine of natural and inherent rights to life, liberty and property was announced in the Declaration of Independence, in the constitutions of New Hampshire, Virginia, and Pennsylvania in 1776, in the constitution of Vermont in 1777, in that of Massachusetts in 1780, in that of New Jersey in 1784. Other constitutions followed in the same vein. Section 3 of Article 1 of our own constitution refers to natural rights of man and section 2 of the same article provides that "in their inherent rights to life, liberty and the pursuit of happiness, all members of the human race are equal." There are those who maintain that man has no natural rights; that none can exist except in society, and that whatever rights he has, he, accordingly, receives from society. However that may be theoretically, natural rights are recognized by our constitution. The doctrine is part of the positive law of the land, and section 6 of Article 1 of our constitution provides that no person shall be deprived of life, liberty or property without due process of law. The article evidently refers to the natural and inherent rights otherwise mentioned, and so it becomes apparent, particularly in view of the history above outlined, that the framers of the constitution meant that the protection thereof is important and that they, though loosely defined, should not be unduly invaded.

Now let us look at the other side of the problem. It may be observed that section 6 of Article 1, supra, does not state that "no person shall be deprived of life, liberty or property," but states that no person shall be deprived thereof "without due process of law." That is a recognition of the fact that the natural and inherent rights are not absolute or limited, but are relative. It is a recognition, in other words, of the police power. That power, giving the legislature the

right to enact laws for the health, safety, comfort, moral and general welfare of the people, is an attribute of sovereignty, is essential for every civilized government, is inherent in the legislature except as expressly limited, and no express grant thereof is necessary. 11 Am. Jur. 966-968. It is expressly recognized in our constitution, which in Sec. 2 of Article 10, states that "the police power of the state is supreme over all corporations as well as individuals."

That power, on the other hand, is not unlimited. The phrase "due process of law" has, on its face, but a procedural aspect, relating to proceedings before judicial or quasi-judicial tribunals, and in the early cases, appeal to that phrase was made from that standpoint only. It was not until the second half of the 19th century that a contrary view came definitely to be taken. The doctrine of natural and inherent rights asserted itself. So in Commonwealth v. Alger, 7 Cush. (Mass.), decided in 1853, and in Thorpe v. Rutland R. R. Co., 27 Vt. 140, 62 Am. Dec. 625, decided in 1855, it was held that the police power is not unlimited. That rule came soon to be fixed more definitely, and in Wynehamer v. People, 13 N. Y. 378, (1856), the court decided that the police power is definitely limited by the constitutional provision for due process, and that that provision has, accordingly, a substantive aspect as well as a procedural one. See Mott, Due Process of Law, 313-317. That is the view which has been maintained by the courts ever since that time, and so we find it stated as a general rule that it has reference also to the enactments of the legislature. 12 C. J. 1190.

Nearly every law abridges individual freedom of action to a more or less extent. In nearly all instances when one is enacted, it gives rise, or may give rise, to a conflict between such freedom on the one hand, and the power of the legislature to abridge it on the other. The solution of the conflict is judicial in its nature.

Courts must be, and are, whether willingly or not, the ultimate arbiters as to whether or not there is, in a particular case, an unwarranted invasion of the guaranteed rights above mentioned. 11 Am. Jur. 1087. They have found that solution,—the only one possible or just under the circumstances—in the standard of reasonableness. 6 R. C. L. 236; 11 Am. Jur. 1073-1074. That standard is indefinite. What is reasonable depends on the facts and circumstances. 11 Am. Jur. 1074; 6 R. C. L. 236, 239; 19 R. C. L. 807. Paine's thought that, as civilization progresses, men will more and more regulate their own affairs has not proved itself correct. Altruism has not proceeded that far. History is replete with the wreckage of rules of private law. It would be no less than surprising, if it were otherwise in the field of public law. As the number of people increases, as trade develops, as civic centers become crowded, as society becomes more complex, more and more problems arise which must be solved, and the freedom of movement and of action of the individuals must be harmonized with equal rights for all. That is not always easy to do. Certain rules have been laid down to help.

In order that a statute may be valid, the purpose, aim, or end thereof must be within the scope or purview of the police power, and in furtherance thereof; the means adopted must be reasonable and not arbitrary, and must be appropriate for the accomplishment of the end in view; in other words, there must be a substantial connection between the purpose in view and the actual provisions of the law. 12 C. J. 929-930; State v. Buck Mercantile Co., 38 Wyo. 47, 264 Pac. 1023; 57 A. L. R. 675. Furthermore, courts recognize that the legislative department of the government is the department primarily constituted to determine what measures are necessary and proper to further the legitimate purposes or objects of the power above men-

tioned, and they accordingly hold that if a statute reasonably tends to further such object, and is a fairly appropriate and reasonable means for that purpose under all the circumstances, then only the question of the wisdom of the law remains, which, in view of the purpose of the existence of the legislative department, should be left to it to determine. State v. Buck Mercantile Co., supra; 11 Am. Jur. 1080, 1081. Moreover, courts, recognizing that that department is of equal dignity with the judicial, deem it proper to go even further. They proceed upon the assumption (unfortunately at times out of harmony with the facts) that the members of that department will investigate and determine for themselves as to whether or not any proposed law will violate the constitution, and they have, accordingly, adopted the rule that no law will be declared unconstitutional unless it is clearly so. Some judicial utterances would seem to go beyond the rules here stated. Thus it is said—without any dissent—in Noble State Bank v. Haskell, 219 U. S. 104, 31 Sup. Ct .186, 55 L. Ed. 112 (a statement oft repeated by other courts) that the police power "may be put forth in aid of what is * * * held by the prevailing morality or strong and preponderant opinion to be greatly and immediately necessary to the public welfare." The eminent jurist who wrote that opinion, somewhat emphasizing the foregoing, stated in his dissenting opinion to Tyson & Bro. v. Banton, 273 U. S. 413, 47 Sup. Ct. 426, 434, that aside from the fact that property cannot be taken without just compensation, "the legislature may forbid or restrict any business when it has a sufficient force of public opinion behind it," and that if the people, speaking through the legislature, want anything, there is nothing in the constitution which forbids them having it. That seems not to be in consonance with our constitution, which in Section 7 of Article 1 provides that "absolute arbitrary power

over the lives, liberty and property of freemen exists nowhere in a republic, not even in the largest majority." It is hardly a debatable question whether majorities may not act as arbitrarily as King John or Louis the Fourteenth. We are not able to state whether, in the long run, courts will be able to withstand preponderant majorities. That is for the psychologist to say. It may be that, in the long run, might will make right. But it would seem that courts should not adopt such fatalistic attitude, so long as the constitution commits to them the power and duty to say what is "right." It would seem further that in view of the position which courts occupy under our constitutional form of government, and to uphold true democracy under the constitution, it is incumbent upon them, in deciding constituitonal questions such as the one before us, to avoid Scylla on the one hand and Charybdis on the other, and to travel at all times, so far as is humanly possible, along the path of the golden mean. Let us then examine the immediate question before us in that light.

■ The statute in question condemns acts committed with intent (a) to injure competitors and (b) to destroy competition. Some contention is made that the clause of the statute "for the purpose of injuring competitors and destroying competition" affects only the clause immediately preceding, and not the clause relating to the sale and advertisement below cost. We think, however, that this was not the intent of the legislature, and we need not add anything on this point beyond what was said in People v. Kahn (Cal. App.) 60 P. (2d) 696; Balzar v. Caler (Cal. App.) 74 P. (2d) 839; Great Pacific Tea Co. v. Ervin, 23 Fed. Supp. 70; Wholesale Tobacco Bureau etc. v. National Candy & Tobacco Co. (Cal. Sup. Ct.) 82 P. (2d) 3.

■ *Scope of Police Power.*

In many cases it is readily conceded that the aim of

a statute comes within the purview of the police power. That is true, for instance, when legislation aims at the preservation of health or morals. It is not so readily conceded in cases in which the aim of the law is purely along economic lines, as in the statute before us—at least to a large extent—and it may be well, accordingly, to briefly consider that point separately. That the legislature may make provision for the economic welfare of the people generally has been decided many times, and cannot now be doubted. Miller v. Board, 195 Cal. 477, 234 Pac. 381, 38 A. L. R. 1479; Chow et al. v. Santa Barbara, 217 Cal. 673, 22 P. (2d) 5; Pettis v. Alpha Alpha Chapter, 115 Nebr. 525, 213 N. W. 835; C. B. & Q. Ry. Co. v. People, 200 U. S. 561, 26 S. Ct. 341, 50 L. Ed. 596; Nebbia v. New York, 291 U. S. 502, 54 Sup. Ct. 505, 78 L. Ed. 940, 89 A. L. R. 1469. In Smith v. Commonwealth, 175 Ky. 286, 194 S. W. 367, it was said that the power extends "to insure such economical conditions as are required by an advancing civilization." Thus the legislature may enact legislation to encourage agriculture (American Sugar Ref. Co. v. Louisiana, 179 U. S. 89, 45 L. Ed. 102, 21 Sup. Ct. 43) ; to encourage steam laundries and discourage hand laundries (Quong Wing v. Kirkendall, 223 U. S. 59, 32 Sup. Ct. 192) ; to encourage marketing associations (Liberty Warehouse Co. v. Burley Tob. Growers etc. Ass'n., 276 U. S. 71, 28 Sup. Ct. 291) ; to prohibit the manufacture of oleomargarine (McCray v. U. S., 195 U. S. 769, 24 Sup. Ct. 769). Many more illustrations might be given.

Approaching nearer to the question involved herein, all combinations or agreements which unreasonably suppress competition or restrain trade were illegal at common law as against public policy. 41 C. J. 101. The Sherman Anti-Trust Act was passed pursuant to that policy. Here was an interference with business in the field of competition—different, it is true, than

that evidenced by the statute before us, but an interference nevertheless, and the aim was partially at least the same as under our statute, namely, the maintenance of fair competition. The Clayton Act was passed in 1914 to supplement the Sherman Anti-Trust Law. Section 2 of the Act (15 U. S. C. A. Sec. 13) prohibits price discrimination between different purchasers. The validity of the Act is not questioned. It, too, directly interferes with business in the field of competition, and declares discriminatory sales to be an evil. The Federal Trade Act, the validity of which is not questioned, was passed in 1914. That Act (15 U. S. C. A. Sec. 45) declared unfair methods of competition in commerce unlawful. That in its ultimate analysis is true under the statute before us. Its aim is to maintain fair competition, but to prevent unfair and ruinous competition. Whether free and unlimited competition, or the contrary, shall prevail, is an economic question, and the policy with reference thereto is, primarily at least, for the legislature to determine. That was held thirty-five years ago in Northern Securities Company v. United States, 193 U. S. 197, 337, 24 Sup. Ct. 436, 457, 48 L. Ed. 679. The statute evidently seeks to protect not only the public, but also individual competitors; it seeks to give the latter a fair opportunity in the economic field. It has been held that, in the furtherance of promoting economic welfare, the legislature may, for the public good, in a reasonable manner, equalize economic opportunities. In Whitney v. Newbold, 270 Ky. 209, 109 S. W. (2d) 406, the court found partial justification for regulating private carriers in the fact that common carriers would otherwise be exposed to financial ruin. In Kelley v. Finley, 207 Ind. 557, 194 N. E. 157, justification for regulating private carriers was found partially in the fact that the railroad system in the state might otherwise be destroyed. In the case of Great Atlantic & Pacific Tea Company

v. Grossjean, 301 U. S. 412, 57 Sup. Ct. 772, it was said by Mr. Justice Roberts for the majority of the court:

"Taxation may be made the implement of the exercise of the state's police power, and proper and reasonable discrimination between classes to promote fair competitive conditions and to equalize economic advantages is therefore lawful. If in the interest of the people of the state, the legislature deemed it necessary either to mitigate evils of competition between stores and chains or to neutralize disadvantages of small chains in their competition with larger ones, or to discourage merchandising within the state by chains grown so large as to become a menace to the general welfare, it was at liberty to regulate the matter directly or to resort to the type of taxation evidenced by the Act of 1934 as a means of regulation."

Some of the justices who sat in the case dissented, but so far as their opinion shows, there was no dissent from the statement here quoted.

We have no facts or figures to show how the public at large would fare if unlimited competition were permitted. In some cases at least, with the possibility in all, competitors could be driven out of business, enabling the survivor to raise the prices to the injury of the public. In regard to the use of so-called "leaders" it has at times been urged that the public at large is injured thereby; that the loss incurred by the use of such leaders will either have to be made up by higher prices charged on other commodities, or by the enforcing of various economies, such as the lowering of wages, discharge of employees, lowering of rents, etc. See Wholesale Tobacco Dealers Bureau v. National Candy & T. Co. (Cal.) 82 P. (2d) 3, 13. In any event there is a large portion of the body politic which believes that, from a social standpoint, price cutting in

the long run adversely affects public interest, and that the public will be adequately protected against excessive prices by the ordinary play of fair competition. Max Factor & Co. v. Kunsman, 5 Cal. (2d) 446, 55 P. (2d) 177. See also Old Dearborn D. Co. v. Seagram-Distillers Corporation, 299 U. S. 183, 57 Sup. Ct. 139, 81 L. Ed. 109, 106 A. L. R. 1476, where the opinions for and against this view are stated. See further Federal Trade Comm. v. Baladam Co., 283 U. S. 643, 51 Sup. Ct. 587.

It is not only recently that courts have recognized the fact that ruinous competition may be an evil. The court in Ware-Kramer Tobacco Co. v. American Tobacco Co., 180 Fed. 160, 170 (1910), stated that "while it is true that fair competition is the life of trade, it is equally true that unfair and excessive competition is death to trade." In the case of Palmer v. Stebbins, 3 Pick. (Mass.) 188, decided in 1825, approved in Whitney v. Slayron, 40 Me. 224, 230 (1855), the court said:

"Whether competition in trade be useful to the public or otherwise, will depend on circumstances. I am rather inclined to believe that in this country at least, more evil than good is to be apprehended from encouraging competition among rival tradesmen or engaged in commercial concerns. There is a tendency, I think, to overdo trade, and such is the enterprise and activity of our citizens that small discouragements will have no injurious effect in checking in some degree a spirit of competition."

In Kellogg v. Larkin, 3 Pinney (Wisc.) 123, 56 Am. Dec. 164, decided in 1851, the court stated:

"If it be true that competition is the life of trade, it may follow such premises that he who relaxes competition commits an act injurious to trade; and not only so, but he commits an act of overt treason against the commonwealth. But I apprehend it is not true that

competition is the life of trade. On the contrary that maxim is one of the most unreliable of the host that may be picked up in every market place. It is in fact the shibboleth of mere gambling speculation, and is hardly entitled to take rank as an axiom in the jurisprudence of this country. I believe universal observation will attest that for the last quarter of a century competition in trade has caused more individual distress, if not more public injury than the want of competition."

That was written in the days when the doctrine of laissez faire was still in vigor; when the existence of the spirit of individualism in this country was not questioned. If ruinous competition was an evil then, the legislature may, we think, recognize it as an evil now, and find a proper remedy for it. Sometimes that spirit of individualism can best be fostered by want of legislation. But that is not always true. No legislation in that connection was necessary while this country was being developed. The situation has changed. Great aggregations of wealth control much of the merchandising field of today. It is not necessary to say that that is an evil. We may even admit that it is a benefit. At the same time we still have with us the independent merchants. They, too, of course, are subject to the prohibition of the statute, but it was probably intended mainly for their benefit. They have hitherto been considered as part of the "backbone" of every community, radiating their influence throughout the length and breadth of the state, maintaining, not alone fair competition, but adding to, and upholding, the moral fibre of the communities, upon which, in the long run, the existence of the commonwealth depends. The legislature has the right, we think, to give them a fair chance in the field of competition; to give them a chance to remain a pillar of support, thus at the same time giving an opportunity for the maintenance of individualism, still of importance in our day, and

which, except for such legislation, might be entirely crushed.

### ■ *Means Adopted.*

We pass on to the next question, namely, whether or not the means adopted by the legislature is reasonable and appropriate to the end in view. Is it a reasonable remedy to cure the evil mentioned? That is a different question from that already discussed. But it is closely associated with it, since, if ruinous price cutting is an evil, which the legislature has the right to remedy, it can do so, it would seem, only, or at least only effectively, by some sort of limitation set upon prices. Hence some further reference will be found to the point already discussed as we proceed herein. In this case the statute has made the intent specified therein an important element of the prohibited acts, and we need but to inquire as to whether or not the legislative act in question is reasonable and appropriate in view of that fact. Great stress was laid on the oral argument on that intent, and it is contended, if we understand counsel correctly, that no matter how lawful, per se, the sale below cost may be, if it is made with the intent specified in the statute, that fact itself should make the sale actionable in a civil case and punishable in a criminal case. The claim is too far-reaching. The character of the act itself, disassociated from the intent—the sale below cost—must also be considered. The law does not deal with a man's inner feelings disassociated from his acts even in criminal cases. Wharton on Criminal Law (11th Ed.) Sec. 152. Many decisions hold that the law takes no account in a civil case of the intent with which an act is done, if the act itself is lawful. See note 62 L. R. A. 673; Cooley on Torts (4th Ed.) Sec. 534; 21 Iowa Law Review 181; 18 Harvard Law Review 41; review of the thought under the Roman and the Civil Law in 22 Harvard

Law Review 501-519. If one does an act which is lawful in itself, and the right to do so is absolute, he should not be subjected to the judgment of a capricious jury to determine whether or not there was some secret motive behind the act. Beardsley v. Kilmer, 236 N. Y. 80. A man, for instance, has the undoubted and inherent right, in order to make a living, to establish an ordinary business in a community. He will naturally and inevitably injure a competitor or competitors already there. The newcomer would not engage in his venture except with the thought that he will be able to get some of the business away from the others. He has in all such cases, in the very nature of things, the specific intent to injure the latter, and in most instances, if not all, to drive out competition as nearly as he is able to do so. But it would not do to hold that he can be punished. His excuse and justification lies in the fact that he engages in business for the purpose of making a living, and to do that is, of course, an absolute and inherent right which the legislature should not be able to take away. If, however, he does not engage therein for that purpose, but merely for the purpose of injuring another, a different question arises. See Tuttle v. Buck, 107 Minn. 145, 119 N. W. 966, 22 L. R. A. N. S. 599; Dunshee v. Standard Oil Company, 152 Iowa 818, 132 N. W. 371, 36 L. R. A. N. S. 263. The editor of the note in 62 L. R. A., supra, on page 727, summarizing his conclusion as to the weight of authority in this connection, states the following two rules:

(1) "If one does an act which he has a perfect right to do, to accomplish some real benefit or pleasure to himself, or others in whom he has a genuine interest, and for doing which in good faith no action would lie, he is not rendered liable to an action therefor by the fact that he did it from bad motive and with intent to injure another, and such injury results."

(2) "But if one with the sole and malicious purpose

of injuring another, and without any benefit, interest, or pleasure (other than that which he derives from his wicked intent) to himself or others, commit an act which, if done in good faith, would be justifiable, he is liable in an action in favor of such other person for the damage he may have sustained therefrom."

The legislature may, of course, within reason, go beyond the common law rules and declare acts tortious or criminal which were not so previously. That, doubtless, would be true in connection with cases covered by the second rule above mentioned. But the legislature went beyond that rule. It has declared acts unlawful though the motive of gain co-exists with the intent to injure—acts, accordingly, which at common law would be entirely innocent, and would fall within the first of the above mentioned rules. Can the legislature modify that rule? Since the intent alone cannot be punished, we are logically driven to a consideration of the act itself—disassociated from the intent—the sale below cost—and must inquire whether that is subject to regulation, and can thus be made unlawful when done, as the statute requires, with the intent therein specified. Counsel for the defendant contends that the act is not subject to the regulation undertaken by the legislative act in question; that defendant has an inalienable right to sell his property at his discretion; that the statute fixes prices; that it violates his fundamental rights, and undertakes to take his property and interfere with his right to contract without due process of law. He relies on Wolf Packing Co. v. Court of Ind. Relations, 262 U. S. 522, 43 S. Ct. 630, 61 L. Ed. 1103; Tyson & Bro. v. Banton, 273 U. S. 418, 47 S. Ct. 426, 71 L. Ed. 718, 58 A. L. R. 1236; Williams v. Standard Oil Co., 278 U. S. 235, 49 S. Ct. 115, 73 L. Ed. 278, 60 A. L. R. 596; and see H. Earl Clack Co. v. Public Service Com., 94 Mont. 488, 22 P. (2d) 1056. In these cases the legislature sought to fix, absolutely, the price of a

commodity or labor. It was held that the subject sought to be regulated was not affected with a public interest and that the attempted regulation was unreasonable. These cases, of course, are clearly distinguishable from the case at bar. The legislature, by the statute here in question, sought, not to fix prices, but to prevent ruinous price cutting, by which competitors might be injured and competition be destroyed. To do that, it was, of course, necessary to fix some limit. It might, perhaps, have set other limits than that which was fixed. The limit of "not below cost" was only one of a number of others which might, perhaps, have been selected. The one actually selected was thought to be the most just under the circumstances. It was but a means to an end, not an end in itself. As was said in Stephenson v. Binford, 287 U. S. 251, 53 S. Ct. 181, 77 L. Ed. 288, speaking of the power of a commission to fix the minimum rate for private carriers: "The authority is limited to the fixing of minimum rates. The contract carrier may not charge less than the rates so fixed, but is left free to charge as much more as he sees fit and can obtain. Undoubtedly this interferes with the freedom of the parties to contract, but it is not such an interference as the fourteenth amendment forbids." See also State v. Drayton, infra.

The statute before us covers all business and not only that which has been held to be affected with a public interest, as commonly understood. And inasmuch as it was clearly the intention of the legislature not to separate the various kinds of business, the constitutionality of the statute will depend on whether or not the legislature can make the regulation as to all sales including sales of property not affected with a public interest. A few cases directly in point have been decided lately, namely, People v. Kahn, 19 Cal. Ap. 2nd Supp. 758, 60 P. (2d) 596; Balzar v. Caler (Cal. App.) 74 P. (2d) 839; Rust v. Griggs (Tenn.)

113 S. W. (2d) 733; Wholesale Tobacco Dealers Bureau v. Nat. Candy & T. Co. (Cal.) 82 P. (2d) 3. All these cases, except Balzar v. Caler, have upheld legislative acts similar to the one before us. In order that it may not be thought that these cases merely followed a popular wave prevalent at the present time, we shall hereafter refer, among others, to cases which were. decided a number of years ago, the ruling principle of which bears an analogy to the ruling principle which should govern in the case now before us.

In a number of instances legislatures have interfered with, and have limited, the absolute discretion of the seller in the disposition of property not affected with a public interest. That has been true under statutes which made it unlawful for a party to sell at discriminatory prices in different places in the state. While in these cases the legislature aimed at uniform, instead of minimum prices, the interference with the right to set prices at discretion was as sharp as in the statute in question here. And the ultimate aim—sales at ruinous prices so as to stifle or destroy competition —was the same as at least part of the aim contained in our statute. In Fairmont Creamery Co. v. Minnesota, 274 U. S. 1, 71 L. Ed. 893, 47 S. Ct. 506, 52 A. L. R. 163, the Supreme Court of the United States held unconstitutional a law of Minnesota which forbade discriminatory prices in different parts of the state without giving opportunity to meet competitive prices. Statutes, however, which forbade discriminatory prices with intent to destroy or stifle competition have been uniformly upheld as constitutional by the state courts as well as by the Supreme Court of the United States. State v. Drayton, 82 Nebr. 254, 117 N. W. 768, 23 L. R. A. N. S. 1287; State v. Creamery Co., 153 Iowa 702, 133 N. W. 895, 42 L. R. A. N. S. 821; State ex rel. v. Standard Oil Co., 111 Minn. 85, 126 N. W. 527; State v. Bridgman, 117 Minn. 186, 134 N. W. 496; State v.

Central Lumber Co., 24 S. D. 136, 123 N. W. 504, 42 L. R. A. N. S. 804; Central Lumber Co. v. State, 226 U. S. 157, 33 Sup. Ct. 66. See note 52 L. R. A. 172. Of particular interest here is the Nebraska case, from which we quote:

"The whole fabric of civilized, social, and commercial life, and the enjoyment of liberty and ownership of property, are based upon compromises and limitations of the use of one's members and the control of his property. The act in question only provides against the use and sale of one's property for the purpose of destroying the business of a competitor. The owner or dealer may sell for any price he may choose, or on any terms he may adopt, without reference to what effect his action may have upon the trade or business of others, so long as he does not do so for the purpose named. It may be that by underselling others he may draw trade away from them, or, indeed, the secondary effect may be to compel them to adopt his scale of prices or abandon their business, yet, if his conduct is not for the purpose and with the intention prohibited by the statute, he is violating no law, and no one can legally object to or interfere with his methods. The statute clearly makes the purpose with which the act is done the controlling element of the offense. As claimed by counsel for the state, the statute under consideration was enacted for the purpose of supplying a defect in the anti-trust laws of the state. It is within the knowledge of all that in many instances persons engaged in the sale of commodities in general use by the people have depressed prices in one locality where there was competition and increased them in others where there was none, thus avoiding loss, until the competitor was driven out of business, when prices would be raised to an unreasonable and oppressive extent, and the people of the district or community supplied from that point would be the sufferers. It was evidently the intention of the legislature to prevent that course of conduct, if resorted to for that purpose. * * * * The legislature * * * * has determined that the prohibition of the reduction of the price of commodities in general use in any particular locality,

'for the purpose of destroying the business of a competitor in such locality,' and discriminating 'between different sections, communities, or cities' by underselling at the point of competition for the purpose named, would be conducive to 'the general welfare' of the people compelled to purchase such commodities, and by the act in question has sought to remedy the evil. Has it not the power to do so? As said in Yick Wo v. Hopkins, 118 U. S. 370, 30 L. Ed. 226, 6 Sup. Ct. Rep. 1064, and quoted in Powell v. Pennsylvania, 127 U. S. 685, 32 L. Ed. 256, 8 Sup. Ct. Rep. 996. 'The very idea that one man may be compelled to hold his life, or the means of living, or any material right essential to the enjoyment of life, at the mere will of another, seems to be intolerable in any country where freedom prevails, as being the essence of slavery itself.' If the state has not the power to protect its people from the acts of those who have for their 'purpose' the destruction of the business of a competitor in order that the wrongdoer may have a monopoly, its powers are much more limited than we had supposed."

In Porto Rican American Tobacco Company v. American Tobacco Company, 30 F. (2d) 235, the defendant was enjoined from selling Lucky Strike cigarettes in Porto Rico at a less price than in the United States. Judgment was entered pursuant to Section 2 of the Clayton Act (15 U. S. C. Sec. 13) which makes it unlawful to discriminate in price between different purchasers where the effect of such discrimination is to substantially lessen competition or tend to create a monopoly. The appellate court, in upholding the trial court, while not passing on the constitutionality of the act, stated:

"If the appellant discriminated in price between different purchasers—those of the United States and Porto Rico—and the purpose of such discrimination was not in good faith to meet competition, or to create a monopoly, the statute is violated, and the appellee, if injured thereby, is entitled to injunctive relief. * * * Ruinous competition by lowering prices has been recognized as an illegal medium of eliminating weaker

competitors. Standard Oil Company v. United States, 221 U. S. 1, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. N. S. 834; Ann. Cas. 1912 D. 734; United States v. American Tobacco Co., 221 U. S. 106, 31 Sup. Ct. 634, 55 L. Ed. 663."

In the case of State v. Atlantic Ice & Coal Company, 210 N. C. 742, 188 S. E. 413, it appears that a statute of that state made it a misdemeanor to wilfully injure a competitor so as to drive him out of business, including among the prohibited acts sales made without adequate profit. The evidence tended to show that the defendant established prices, and made sales, below cost. On appeal from conviction the constitutionality of the statute was upheld, the court among other things stating that "Ruinous competition by lowering prices has been recognized as an illegal medium of eliminating weaker competitors." In Nebbia v. New York, supra, the court stated:

"If the lawmaking body within the sphere of government concludes that the conditions or practices in an industry make unrestricted competition an inadequate safeguard of the consumer's interests, produce waste harmful to the public, threaten ultimately to cut off the supply of a commodity needed by the public, or portend the destruction of the industry itself, appropriate statutes passed in an honest effort to correct the threatened consequences may not be set aside because the regulation adopted fixes prices reasonably deemed by the legislature to be fair to those engaged in the industry and to the consuming public."

Of analogy herein, too, we think, are the cases which deal with legislative acts aimed at preventing price-cutting of articles sold under a trade or brand name or under a trademark, and providing that when goods are originally sold under a contract fixing the retail price, they shall not be sold for a price less than that so fixed. While such statutes are made for the protection of manufacturers, they go further than that. The

basic theory of such statutes is, as stated in Max Factor & Co. v. Kunsman, 5 Cal. (2d) 446, 55 Pac. (2d) 177 (Affirmed 299 U. S. 198, 57 Sup. Ct. 147), "that, from a social standpoint, price cutting in the long run adversely affects public interest, and that the public will be adequately protected against excessive prices by the ordinary play of fair and honest competition between manufacturers of similar products." Statutes of that character have been upheld as constitutional in the case just cited, and in Old Dearborn Dist. Co. v. Seagrams Dist. Co., 363 Ill. 559, 2 N. E. (2d) 929, 104 A. L. R. 1435, affirmed by the Supreme Court of the United States, 229 U. S. 183, 57 Sup. Ct. 139. See also note to 104 A. L. R. 1452; Johnson & Johnson v. Weisboard (N. J. L.) 191 Atl. 873; Weco Products Co. v. Reed Drug Co. (Wisc.) 274 N. W. 426.

It is undoubtedly true that under our form of government, the use of property and the making of contracts are and should be normally matters of private and not of public concern. The general rule is that both shall be free of governmental interference. Nebbia v. New York, supra. But neither property rights nor contract rights are absolute. The ordinary business is not conducted for the purpose of loss. The legislature has not undertaken to compel merchants to do anything out of the ordinary, but only what is usual and customary. It has merely attempted to have each merchant give a fair chance to the other and do business without evil intent. That cannot be considered arbitrary. "Altruism ought to have some place in the consideration of ennobling motives." Beardsley v. Kilmer, supra. We think, accordingly, that we cannot say that the means adopted by the legislature in furtherance of the purpose of the law, are unreasonable. Nor can we say that they are inappropriate. The court in Balzar v. Caler, supra, thought that the statute in question tends to encourage monopolies and destroy

competition rather than the contrary, on account of the fact that large industrial concerns can at all times undersell merchants with limited capital. We do not think that the legislature was compelled to accept that view as conclusive. The court in that case considered merely the question of prices. It overlooked the factor of good will. The independent, or any other, merchant may be able to maintain himself on account of such good will, notwithstanding the fact that others undersell him to some extent, provided they do not undersell him too much. See further on this subject Wholesale Tobacco Dealers v. National Candy & T. Co., supra.

■ *Indefiniteness.*

It is claimed that the statute is void for uncertainty, because it is impossible under it to determine the cost of merchandise. It is a general and universally accepted rule that in creating an offense which was not a crime at common law, a statute must be sufficiently certain to show what the legislature intended to prohibit and punish, otherwise it will be void for uncertainty. 16 C. J. 67. However, reasonable certainty is all that is required and liberal effect is always to be given to the legislative intent when possible. 16 C. J. 68. And if a statute is susceptible of two constructions, one of which will render it constitutional and the other unconstitutional, it is the duty of the court to adopt that construction which, without doing violence to the fair meaning of the language, will render it valid. 12 C. J. 788. Let us examine the section of the statute under consideration in the light of these rules.

The first paragraph of Section 2 of the act does not attempt to define the cost of each article, but merely forbids, under the conditions named, the sale or giving away of merchandise below cost. The second paragraph attempts to define the cost of a stock of merchandise, fixing it at invoice price or replacement cost,

plus cost of labor and overhead expenses. That is a general definition, and it would seem that no exceptions to such definition could be taken, unless it is too indefinite. The third paragraph attempts to define somewhat more accurately the cost of doing business, or overhead expenses, and requires to be included therein labor, salaries, rent, interest on capital, depreciation, selling cost, maintenance of equipment, delivery cost, etc. The court in Balzar v. Caler, supra, thought that these various items were, by this section, to be added to each item of merchandise—instead of the proper proportion thereof. There seems to be no justification for such construction. These items must be included in the cost of doing business—nothing more. The proportion to be added to each item of merchandise is not attempted to be stated, but that this must be done is implied in the language of the statute. People v. Kahn, supra. It can scarcely be doubted that each of these items are proper items to be taken into consideration. The extent thereof is not stated, and the court in Balzar v. Caler, supra, thought that this should have been done. The court said on that point:

"Moreover, the statute fails to state what period of time is to be included in estimating overhead expenses which are to be added to the invoice price of the article to be sold so as to determine the cost of resale thereof. A merchant's stock of trade varies from time to time. Meats, bakery products and certain classes of groceries deteriorate rapidly. Is the merchant to take stock and hold an accounting every time he wishes to display for sale a few leader articles below normal price for the purpose of advertisement? For the purpose of such sales is he to estimate his average overhead expenses for the period of a year, or for a month, or is he to ascertain that sum on the very day on which he proposes to sell the forbidden article? By what standard is a merchant to determine such elements as depreciation of goods, selling cost, or credit losses? What is to be the measure of the value of his equip-

ment? Is there to be no limit of expenditures for interest, insurance or advertising? The statute throws no light upon these perplexing problems. Every merchant is left to guess at the rules and standards to be applied and to determine for himself the period for which the overhead expenses are to be calculated. The section is therefore uncertain and void in that regard."

The argument at first blush seems formidable. But it would seem that, upon analysis, it will be found that if the legislature should attempt to do what that court intimates it should do, a greater interference with freedom of action would result than by the legislative act in question. Would it be feasible or advisable or consistent with inherent rights for the legislature to prescribe that a merchant shall not be permitted to spend more than a certain, limited amount for advertisement? Should it prescribe the amount for depreciation? If so, it would be required, in order to obviate constitutional objections, to make a multitude of classes, and be exceedingly careful in its classification, for the proper amount varies, as is pointed out in the above case, in the various classes of business. The proper period of time to be included in estimating overhead expenses may not be the same in the case of one merchant as in the case of another. Time may make little difference for a candy kitchen; three months time may be proper for a butcher; six months time for the clothier, for, by way of example, replacement cost may vary in the various classes of business. These illustrations suffice to show the obstacles in the way of the legislature to do what the California court above mentioned intimates should be done, and that these matters had better be left to general business methods. The legislature, doubtless, had such general business methods—reasonable standards of cost-accounting for the various classes of business—in mind and believed them to exist. If they do not exist—if cost cannot be ascertained—then the act in question

should be held to be unconstitutional. If, on the other hand, the cost is ascertainable, under reasonable methods, then such cost is purely a question of fact, definite and certain, and the standard of conduct set by the legislature, too, is definite and certain. The non-existence of such reasonable methods cannot be presumed by the court, and if that is so, then the burden of showing it, in order that we might act upon it, was on the defendant, for upon him lies the duty to show the statute to be unconstitutional (12 C. J. 791-794), but no evidence was introduced in this case. Cost-accounting has been in vogue for centuries, as shown in the article on that subject in Vol. 6 of the 14th edition of the Encyclopaedia Brittanica, and, as there shown, many books on that subject have been published from time to time. It is stated in Rieder v. Rogan, 12 Fed. Supp. 307, 318, that courts take judicial notice of the fact that modern systems of accounting have become very accurate. However that may be, it was, in any event, not alone the right, but the duty of the legislature in framing the statute in question to take into consideration the manner in which business is being done in the state. Nicol v. Ames, 173 U. S. 509, 43 L. Ed. 786, 19 Sup. Ct. 522. We may presume that it did so. Hence, we should hardly be justified, in the absence of evidence to the contrary, in holding that it did not have in mind such reasonable accounting methods in the belief that they in fact exist. Of course, no two merchants adopt exactly the same method. One man may be more cautious than another. One may allow more for depreciation, advertisement, etc., than another. One man may think that the percentage to be added to his invoice price should be that based on the overhead expenses of the past year; another may think that the past six months, or three months, should be the criterion. If a man just starts up in business, he necessarily, in order not to face bankruptcy, must

act upon the experience of others, and obtain his information the best way he can. The invoice price of goods which come into the store is known. All else is more or less proximate, for the expenses may increase or decrease; the rapidity of the turn-over may fluctuate. All of these facts are well known. We cannot hold that the legislature did not know them. Knowing them, and composed of rational beings, we should assume that it took them into consideration and acted upon them, when it passed the law. Courts presume that it meant the law to be reasonable and just. 12 C. J. 790. Hence, in the absence of provisions to the contrary, we must presume that the legislature did not intend to prescribe that the cost must be absolutely exact, and that it must be based upon the precise method of accounting which any one merchant might adopt, but meant, by "cost," what business men generally mean, namely, the approximate cost arrived at by a reasonable rule. Hence, if a particular method adopted by a merchant cannot, under the facts disclosed, be said to be unreasonable, and does not disclose an intentional evasion of the law, the method so adopted should be accepted as correct. In other words, all that a man is required to do under the statute is to act in good faith. Hygrade Provision Co. v. Sherman, 266 U. S. 407, 69 L. Ed. 203, 45 Sup. Ct. 141. In that view of the case, the standard set by the legislature is virtually reduced to one of "reasonableness." And it is held that "reasonableness" as "a standard of an act, which can be determined objectively from circumstances, is a common, widely-used, and constitutionally valid standard in law." People v. Curtis (Cal. App.) 300 Pac. 801, 805, and cases cited. Construed as here mentioned, the statute may, in so far as here discussed, be upheld. There is ample authority for this conclusion. Some of them have gone much farther than it is necessary to go herein—perhaps too far. It appears in State v.

Atlantic Ice and Coal Co., 210 N. C. 742, 188 S. E. 413, that the legislature made it unlawful to sell any article. by lowering the price so as to leave an unreasonable or inadequate profit for a time, with the purpose of increasing the profit later. The court held the act sufficiently definite. In Nash v. United States, 229 U. S. 373, 33 Sup. Ct. 780, the defendant was indicted for conspiracy in restraint of trade, by selling, among other acts, far below cost in order to compel competitors to meet prices ruinous to everybody, and by fixing the price of turpentine below the cost of production, for the purpose of driving competitors out of business. The charge was held sufficiently definite. The Federal Trade Act (15 U. S. C.) Sec. 45 provides that "unfair methods of competition in commerce are declared unlawful." That, it may be noted, is a sweeping provision, fixing no standard at all. The provision was attacked in the case of Sears v. Federal Trade Commission (CCA) 258 Fed. 307, 6 A. L. R. 358. The court, in holding it not void, stated:

"Petitioner urges that the declaration of Sec. 5 must be held void for indefiniteness unless the words 'unfair methods of competition' be construed to embrace no more than acts which on September 26, 1914, when Congress spoke, were identifiable as acts of unfair trade then condemned by the common law as expressed in prior cases. But the phrase is no more indefinite than 'due process of law.' The general idea of that phrase as it appears in constitutions and statutes is quite well known; but we have never encountered what purported to be an all-embracing schedule or found a specific definition that would bar the continuing processes of judicial inclusion and exclusion based upon accumulating experience. If the expression 'unfair methods of competition' is too uncertain for use, then under the same condemnation would fall the innumerable statutes which predicate rights and prohibitions upon 'unsound mind,' 'undue influence,' 'unfaithfulness,' 'unfair use,' 'unfit for cultivation,' 'unreasonable rate,' 'unjust discrimination' and the like. The statute

is remedial, and orders to desist are civil; but even in criminal law convictions are upheld on statutory prohibitions of 'rebates or concessions,' or of 'scheme to defraud,' without any schedule of facts or specific definition of forbidden conduct, thus leaving the courts free to condemn new and ingenious ways that were unknown when the statute was enacted."

In the case of Old Dearborn D. Co. v. Seagram Distillers Corporation, supra, the description of articles in "fair and open competition" was held to be sufficiently definite. In Rust v. Griggs, (Tenn.) 113 S. W. 733, a statute similar to the one here under consideration was involved. The statute of Tennessee provides that the term "cost" to the retailer shall mean (2) "the replacement cost of such product or commodity to the retailer at the time of sale in the quantity last purchased by the retailer, less any legitimate trade discounts * * * and plus a mark up amounting to less than the minimum cost of distribution by the most efficient retailer." The last clause mentioned was attacked. The court said on that point:

"Included in this assignment of error is the proposition that an unreasonable and oppressive burden is placed upon the retailer to locate at his own risk the most efficient retailer and then from the private records of such efficient retailer to ascertain his cost of distribution. We think the words 'most efficient retailer' were not intended to designate any particular individual. The words were used in a generic sense. The cost of distribution, within the contemplation of the legislature, was the cost of distribution by the most efficient retailers. To ascertain such cost of distribution is no great task. Matters of that sort are readily available in numerous trade surveys contained in trade journals and other publications."

In Omaechevarria v. Idaho, 246 U. S. 243, 38 Sup. Ct. 323, it appears that the legislature made it unlawful to herd sheep on a range previously occupied by cattle. It was claimed that the statute was too indefi-

nite because it failed to provide for the ascertainment of the boundaries of a range and for determining what length of time was necessary to constitute a prior occupation a usual one within the meaning of the act. The court held it sufficiently definite, and stated that "furthermore, any danger to sheepmen which might otherwise arise from indefiniteness is removed" by reason of the fact that a criminal intent was necessary to constitute a crime under the act. The same point was mentioned in People v. Kahn, supra, and Hygrade Provision Co. v. Sherman, supra, and is applicable here, although it need not be determined how much importance should be attached to it. It may often be difficult to prove the intent required by the statute, particularly in criminal cases. Perhaps State v. Debolt, 104 Iowa 105, 109, 73 N. W. 499; Brown v. State, 156 Ark. 288, 245 S. W. 813; People v. Flores, 86 Cal. App. 235, 260 Pac. 822; State v. Clark, 98 Wash. 81, 167 Pac. 84; Western Lumber Co. v. State, 17 Okl. Crim. 427, 189 Pac. 868; Dunshee v. Standard Oil Co., 152 Iowa 818, 132 N. W. 371, 36 L. R. A. N. S. 263, 265, might shed some light thereon. We are not concerned with that point in the case at bar in view of the plea of guilty herein. We should add, that the statute has a number of exceptions and provides that the law shall not be applicable under circumstances—or at least many or most circumstances—which make it impossible or improper for a merchant to sell goods at or above cost. The statute, then, should not prove to be a burden to anyone who acts in good faith.

The question of definiteness of the law has herein been fully considered by the writer hereof. It is his opinion that while the defendant by his plea of guilty admitted that he sold below cost with the intent mentioned in the statute, the question is whether these acts constitute a crime; that if they do not, because of the indefiniteness of the law, punishment for his acts in

such case would not be due process of law; (Old Dearborn D. Co. v. Seagram-Distiller Corp., supra); that the point should, accordingly, be decided in this case. My learned associates, however, constituting the majority of the court, think that the point is not involved in this case. Their reasons, briefly stated, are these: The constitutional objection on the ground of indefiniteness is because the statute provides that the "cost of doing business," as therein defined, may be added to the invoice or replacement cost as a part of the "cost" of the article sold. The asserted defect is that the "cost of doing business" may not be known to the seller. The defendant, however, by his plea of guilty, admits making the sale below cost for the purposes denounced by the statute. It must be assumed that he knew the cost of the article, and it may be that the sale alleged in the information was for a price less than the invoice or replacement cost. Defendant's cost of doing business was not determined by the trial court, and may not have been estimated or considered by defendant in making his plea of guilty. In these circumstances a majority of the court are of opinion that it is unnecessary in this case to discuss those parts of the statute which undertake to define the cost of doing business (see Latson v. Wells, 136 Ga. 681, 686, 71 S. E. 1052, 1055; Simpkins v. State, 35 Okl. Cr. 143, 150, 249 Pac. 168, 171; Fenner v. Boykin, 3 F. (2d) 674, 678. See, also, Wholesale Tobacco Dealers Bureau v. National Candy Co., supra; Balzar v. Caler, 82 P. (2d) 19, under a similar statute); that the contention that the statute is invalid for indefiniteness might not have been made if defendant had anticipated our holding that a sale for less than cost was criminal only when made "for the purpose of injuring competitors and destroying competition." See Hygrade Provisions Co. v. Sherman, 266 U. S. 497, 501; Omaechevarria v. Idaho, supra.

With the reservation made by the majority of the court as above mentioned, the constitutional questions submitted to us are answered in the negative. We might add that no other sections of the statute except those herein mentioned have been considered.

RINER and KIMBALL, JJ., concur, with the reservations above mentioned.