STATE OF NEBRASKA V. ROBERT L. DRAYTON.

FILED SEPTEMBER 16, 1908. No. 15,534.

1. Constitutional Law: UNFAIR COMPETITION. The act of the legislature entitled "An act to prohibit unfair commercial discrimination between different sections, communities, or localities, or unfair competition, and providing penalties therefor," approved April 3, 1907 (laws 1907, ch. 157), *held* not to be in violation of the constitution.

2. ———: CLASS LEGISLATION. The said act does not prevent persons and corporations dealing in commodities in general use from selling them at such price as such person or corporation may see proper to demand, nor is it class legislation within the constitutional prohibition.

3. ———: POLICE POWER. The prevention of discrimination in particular localities, in *prices of commodities in general use,* "for the purpose of destroying the business of a competitor," by selling such commodities at a lower rate in such locality than is charged for the same elsewhere, is within the police power of the state.

4. ———: ———: POWERS OF LEGISLATURE. Within constitutional limits, the legislature is the sole judge as to what laws should be enacted for the protection and welfare of the people, and as to when and how the police power of the state is to be exercised.

ERROR to the district court for Antelope county: ANSON A. WELCH, JUDGE. *Exceptions sustained.*

*William T. Thompson, Attorney General, W. B. Rose* and *S. D. Thornton,* for plaintiff in error.

*W. D. McHugh, Jackson & Kelsey* and *Isaac E. Congdon, contra.*

REESE, J.

An information was filed in the district court for Antelope county, in which it was charged that the defendant, the agent of the Atlas Elevator Company, a corporation incorporated under the laws of the state of West Virginia, and doing business in this state and engaged in the sale and distribution of lumber, lime, plaster, cement and brick, commodities in general use in the village of Orchard, in Antelope county, and in the village of Brunswick, in the same county, on the 20th day of August, 1907, in the county and state aforesaid, "did unlawfully, maliciously and intentionally, for the purpose of destroying the business of a competitor in the village of Orchard, in Antelope county, in the state of Nebraska, discriminate between different sections of the state of Nebraska, to wit, the village of Brunswick, in Antelope county, in the state of Nebraska, and the village of Orchard, in Antelope county, in the state of Nebraska, by selling such lumber, lime, plaster, cement and brick at a lower rate in the village of Orchard, in said county and state, than is charged by the Atlas Elevator Company for lumber, lime, plaster, cement and brick in the village of Brunswick, in said county and state, after making due allowance for the difference in the grade quality and the actual cost of transportation from the point of production of said lumber, lime, plaster, cement and brick, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the state of Nebraska."

The defendant filed his motion to quash the information

alleging the following reasons and grounds therefor: "First. Because the legislative enactment by the legislature of the state of Nebraska, under which the said information was filed, contravenes the provisions of the constitution of the United States of America. Second. Because the legislative enactment contravenes the provisions of the constitution of the state of Nebraska, and that such enactment is unconstitutional and void. Third. Because the facts stated in the information are not sufficient to constitute an offense under the laws of the state of Nebraska."

The district court sustained the motion, following the order with the recital: "It appearing to the court that no valid information can be filed against the defendant under the statute and laws of the state, under which the information was filed, it is ordered that the defendant be discharged and his bail released." The county attorney excepted to the ruling and order of the court, and brings the case to this court for review under the provisions of sections 483 and 515 of the criminal code.

There is no attack made upon the form of the information in the briefs of contending parties, and nothing was said upon the subject in the oral arguments; hence no reference will here be made to it. The whole contention is as to the constitutionality of the act of April 3, 1907, published as chapter 157, laws 1907. The act is too long to be copied here in full, and we must be content with a reproduction of the first section, which is as follows: "Section 1. (Local Unfair Discriminations.) Any person, firm, company, association or corporation, foreign or domestic, doing business in the state of Nebraska and engaged in the production, manufacture or distribution of any commodity in general use, that shall intentionally, for the purpose of destroying the business of a competitor in any locality, discriminate between different sections, communities or cities of this state, by selling such commodity at a lower rate in one section, community or city, than is charged for said commodity by said party in

another section, community or city, after making due allowance for the difference, if any, in the grade or quality and in the actual cost of transportation from the point of production, if a raw product, or from the point of manufacture, if a manufactured product, shall be deemed guilty of unfair discrimination, which is hereby prohibited and declared unlawful." The other sections prescribe the penalties for a violation of the law and the methods of its enforcement, but which we need not here notice. We have been favored with able oral arguments at the bar of the court, as well as very elaborate briefs in which a multitude of cases are cited, and with a full discussion of the legal principles contended for, but which it will be impossible for us to refer to in detail without extending this opinion to an unreasonable length. As we understand the contention of counsel for defendant, it may be fairly summarized by the following extract from their brief: "A careful examination of the act reveals that it is directed against persons or corporations doing business in the state and engaged in the production, manufacture, or distribution of 'any commodity in general use'; against persons or corporations dealing in commodities which, until the passage of the act, had universally, and ever since mankind began to trade, been regarded as subjects of legitimate and unrestrained commerce and private enterprise. The act is not directed against dangers to the public health or morals. The act is not directed against so-called natural monopolies or business affected with a public interest. The act attacks trading in commodities in general use. It is the converse of an anti-trust law in being an anti-competition law." The argument is that the object and purpose of the act are not within the police power of the state; that its effect would be to stifle competition and thus foster monopolies; that it takes from the citizen the right to contract and to control his property, destroys freedom in trade, and practically compels the merchant and tradesman to conduct and carry on his

20

business at one place only; that it is class legislation, and "operates upon and against the man who has stores in more than one place, and does not affect the dealer in but one place." It is said: "The fundamental error in the act is that it attempts to inquire into a man's intentions with reference to something that is his own private concern, just as much as his religion or politics. Dealing in commodities in general use is something with which the police power of the state has nothing whatever to do. The citizen is a free man, and is the keeper of his own heart and mind." It is contended that the act is violative of the fourteenth amendment to the constitution of the United States, which provides that no state shall deprive any person of life, liberty or property without due process of law, and that no person shall be denied the equal protection of the laws, and that the similar provision in the constitution of this state is also violated by this act. Many cases are cited by which it is sought to maintain this contention; but, in the view which we take of the law, we are not able to see that they can be applied. They refer, in the main, to the statutes which seek to control and limit transactions in the ordinary and lawful commerce of the country, such as the issuance of trading stamps, the conferring of presents or gratuities out of one's own property for the purpose of drawing custom, the right of the individual to engage in any line of lawful business he may see proper to follow; that acts which discriminate in favor of one as against another class of persons engaged in the same lawful business are infractions of the constitution, and therefore void, as well as acts declaring specified transactions unlawful, but exempting from their provisions certain named classes of persons and lines of business; the maintaining by mining or manufacturing companies of stores, truck shops, etc., by which they sell their goods and wares to their employees on credit at a higher price than is charged other customers who buy for cash; that classifications of persons or things must be general and apply to all similarly situated; acts

which seek to destroy the right of every competitor to fix his own price upon commodities which he may lawfully sell, or money which he may lawfully loan (subject, of course, to usury laws), and, in general, such acts as seek to invade the reserved right of every individual to transact and carry on his lawful business according to his own judgment, in his own way, untrammeled by discriminatory laws, by which others similarly situated are given preferences over him. In the foregoing we have sought to fairly outline the contention of the defendant, giving in this limited way the substance of the holdings of the cases cited without further reference to them.

At the beginning of our investigations we are confronted with the oft-repeated and well-settled doctrine that no act of the law-making power of the state can be held unconstitutional unless it is clearly violative of the provisions of the constitution; that, if it is legally possible to sustain legislative enactments, they should not be held void. We are further met with another well-known rule that what is known as the police power is inherent in every government, and does not depend upon legislative grants or limitations; that unless the act under consideration is open to attack as in violation of the written provisions of the fundamental law, or an illegal effort to extend the police power over a subject which cannot be brought within the rightful exercise of that power, the law must be sustained. It must also be remembered that with reference to the latter subject, the legislative department of the state, within well-known and well-defined limitations, is the sole judge as to when and how that power is to be exercised.

From a careful reading and study of the act in question, we are driven to the conclusion that it is not subject to attack upon either of the grounds named. It does not seek to prevent any person or corporation from engaging in any lawful business, nor does it prevent legitimate competition, nor seek to interfere in any way with the due management of any one's business, nor

prevent the sale of any commodity at any price which the owner may fix or demand. Indeed, the act recognizes the right of all to engage in the production, manufacture, distribution and sale of any and all commodities in general use. There is a clear recognition in law, in commerce, and in the possession and use of property, that every person has the right to use his own as he sees fit, so long as he does not wrongfully use it in such a way as to interfere with the rights of others. The whole fabric of civilized, social and commercial life, and the enjoyment of liberty and ownership of property, are based upon compromises and limitations of the use of one's members and the control of his property. The act in question only provides against the use and sale of one's property for the purpose of destroying the business of a competitor. The owner or dealer may sell for any price he may choose, on any terms he may adopt, without reference to what effect his action may have upon the trade or business of others, so long as he does not do so for the purpose named. It may be that by underselling others he may draw trade away from them, or, indeed, the secondary effect may be to compel them to adopt his scale of prices or abandon their business, yet, if his conduct is not for the purpose and with the intention prohibited by the statute, he is violating no law, and no one can legally object to or interfere with his methods. The statute clearly makes the purpose with which the act is done the controlling element of the offense. As claimed by counsel for the state, the statute under consideration was enacted for the purpose of supplying a defect in the anti-trust laws of the state. It is within the knowledge of all that in many instances persons engaged in the sale of commodities in general use by the people have depressed prices in one locality, where there was competition, and increased them in others, where there was none, thus avoiding loss, until the competitor was driven out of business, when prices would be raised to an unreasonable and oppressive extent, and the people of the district or community sup-

plied from that point would be the sufferers. It was evidently the intention of the legislature to prevent that course of conduct if resorted to for that purpose. The law afforded no protection from the injurious effects of such predatory course. If no protection could be furnished to the people who were compelled to purchase the commodities, it would be easily within the range of possibilities for one person or corporation to practically control the whole commerce of a community, a county, or even the state, exacting such prices as greed might dictate, and yet seeing to it that no others should be allowed to engage in a similar business as competitors. It is within the knowledge of all of mature years that within the last quarter or half century the meats furnished the people of our cities and towns were supplied by local dealers who purchased their live stock from the nearby farmer or stock grower, slaughtered the animals, and supplied wholesome meats at reasonable prices, and yet paid remunerative prices for the live animals, saving the cost of transportation to and from what are now the exclusive points of manufacture and production. That both the producers and consumers are losers is known to all. That this condition has been brought about by a system of coercion and underselling "for the purpose of destroying the business" of local competitors is also known to all. Is there no power anywhere lodged in the state to prevent this or remedy the evil? If there is, it is with the law-making power. If that department of government has the power, it must be by the exercise of the right of police regulation. Has the legislature that power?

Many writers have sought to define and prescribe the true extent and limitations of the police power, but none has succeeded to the approval and satisfaction of all. It must be conceded that in its operation there is no distinction between persons natural or corporate. *Northwestern Fertilizing Co. v. Hyde Park,* 70 Ill. 635. In Tiedeman, Limitations of Police Power, 1, it is said: "The object of government is to impose that degree of restraint upon

human actions, which is necessary to the uniform and reasonable conservation and enjoyment of private rights. Government and municipal law protect and develop, rather than create, private rights. The conservation of private rights is attained by the imposition of a wholesome restraint upon their exercise, such a restraint as will prevent the infliction of injury upon others in the enjoyment of them. It involves a provision of means for enforcing the legal maxim, which enunciates the fundamental rule of both the human and the natural law, *sic utere tuo, ut alienum non lœdas.* The power of the government to impose this restraint is called 'Police Power.' By this 'general police power of the state, persons and property are subjected to all kinds of restraints and burdens, in order to secure the general comfort, health and prosperity of the state, of the perfect right in the legislature to do which no question ever was or upon acknowledged general principles ever can be made, so far as natural persons are concerned.' "

In 22 Am. & Eng. Ency. Law, 915, it is said: "It has been found impossible to frame, and is indeed deemed inadvisable to attempt to frame, any definition of the police power which shall absolutely indicate its limits by including everything to which it may extend and excluding everything to which it cannot extend, the courts considering it better to decide as each case arises whether the police power extends thereto. There have been, however, many attempts to define this power in a general way, and the sum of these definitions amounts to this: That the police power in its broadest acceptation means the general power of a government to preserve and promote the public welfare by prohibiting all things hurtful to the comfort, safety, and welfare of society, and establishing such rules and regulations for the conduct of all persons and the use and management of all property as may be conducive to the public interest." At page 918: "The police power is an attribute of sovereignty, and exists without any reservation in the constitution, being founded

upon the duty of the state to protect its citizens and provide for the safety and good order of society. It corresponds to the right of self-preservation in the individual, and is an essential element in all orderly governments, because necessary to the proper maintenance of the government and the general welfare of the community. Upon it depend the security of social order, the life and health of the citizen, the comfort of an existence in a thickly populated community, the enjoyment of private and social life, and the beneficial use of property, and it has been said to be the very foundation upon which our social system rests. It is founded largely on the maxim *sic utere tuo, ut alienum non lædas,* and also to some extent upon that other maxim of public policy, *salus populi suprema lex.*"

It is true that the ultimate question of the validity of a statutory enactment, by which this power is sought to be exercised, is with the courts, and they will not hesitate to discharge the duty of declaring an act void if clearly so convinced, but subject to the presumptions and limitations herein referred to. The rule upon this subject can, perhaps, be no more clearly expressed by us than by the following: "Under the police power the state can interfere whenever the public interests demand it, and in this particular a large discretion is necessarily vested in the legislature to determine, not only what the interests of the public require, but what measures are necessary for the protection of such interests. But the character of police regulations, whether reasonable, impartial, and consistent with the constitution and the state policy, is a question for the courts, for the police power is too vague, indeterminate, and dangerous to be left without control, and hence the courts have ever interfered to correct an unreasonable exertion or a mistaken application of it; and, when the legislature passes an act which plainly transcends the limits of the police power of the state, it is the duty of the judiciary to pronounce its invalidity and to nullify the legislative attempt to invade the citizen's

right, for to hold that every act of the general assembly passed under the guise of an exercise of the police power or sought to be defended upon that ground was beyond judicial control would render every guaranty of personal right found in the constitution of little or no value." 22 Am. & Eng. Ency. Law, 936. The legislature, as we must conclusively presume, acted upon the fullest investigation, and upon what appeared to it to be reasonable grounds, and, as must be also assumed, has determined that the prohibition of the reduction of the price of commodities in general use in any particular locality "for the purpose of destroying the business of a competitor in such locality" and discriminating "between different sections, communities or cities" by underselling at the point of competition for the purpose named would be conducive to "the general welfare" of the people compelled to purchase such commodities, and by the act in question has sought to remedy the evil. Has it not the power to do so? As said in *Yick Wo v. Hopkins*, 118 U. S. 356, and quoted in *Powell v. Pennsylvania*, 127 U. S. 678: "The very idea that one man may be compelled to hold his life, or the means of living, or any material right essential to the enjoyment of life, at the mere will of another, seems to be intolerable in any country where freedom prevails, as · being the essence of slavery itself." If the state has not the power to protect its people from the acts of those who have for their "purpose" the destruction of the business of a competitor, in order that the wrongdoer may have a monopoly, its powers are much more limited than we had supposed. In *Powell v. Pennsylvania, supra,* the court, quoting from the *Sinking Fund* cases, 99 U. S. 700, said: "Every possible presumption is in favor of the validity of a statute, and this continues until the contrary is shown beyond a rational doubt. One branch of the government cannot encroach on the domain of another without danger. The safety of our institutions depends in no small degree on a strict observance of this salutary rule. * * * The power which the legislature has to promote the gen-

eral welfare is very great, and the discretion which that department of the government has in the employment of means to that end is very large." *Waters-Pierce Oil Co. v. State,* 19 Tex. Civ. App. 1, is an instructive and well-considered case upon the general subject involved in this case. When we take into consideration that it is not the act itself, but the act coupled with the purpose of destroying the business and property of others, which is declared to be criminal, we find but little trouble in arriving at the conclusion that the statute is within the power of the legislature, and is therefore valid.

It is contended by counsel for defendant that "the act interferes with freedom of contract," and is therefore violative of the constitutions of both the federal and state governments. As we have already indicated, we are wholly unable to see where the previously existing right of the individual to enter into lawful contracts is in the least abridged or impaired. It is not the making of contracts which is forbidden, but the conduct, purpose and motives of the party in connection with his acts which brings him within the prohibitions of the law.

It is also contended that the act is void by reason of its classifications, and must therefore be held invalid on the ground of "class legislation." It is said that "the act operates upon and against the man who has stores in more than one place, and does not affect the dealer in but one place"; that "keepers of but one store may compete, intend to build themselves upon the ruins of their fellows who maintain single stores or stores in several places, and to ruin their fellows in order to build themselves up, and the law applauds; but keepers of more than one store doing the very things and with like intentions as single store keepers are frowned upon, fined and imprisoned." To this we must be permitted to say that we are unable to find any provision in the act which is susceptible of the construction contended for. An individual or corporation may have but one place where the commodity dealt in may be stored or kept in stock, and yet in the "distribu-

tion" of that stock may seek to destroy the business of a competitor in another locality, and thus violate the law. There are many cities and villages in this state which are adjacent to each other, sometimes so near as to cause a stranger, unacquainted with their superficial boundaries, to be unable to say where one leaves off and another begins. A dealer in one may, for the purpose of destroying the business of a competitor in the other, so discriminate as between the two places as to violate the statute. Common experience and observation, within the knowledge of all, is to the effect that many of the strongest and most grasping monopolies of the state have their place of business, their business homes, in but one place, and yet they are "distributing" and "selling" their commodities in practically every city and village within the state. They do not desire competition. They do not hesitate to destroy the business of local dealers, wherever found, by unjust discriminations. If prompted by that "purpose," the law is violated, and it is within the power of the legislature to prevent the discrimination. Again, it is said that by the provisions of the law an act which is of itself lawful may be rendered unlawful by reason of the mind or purpose of the individual accused, and that such mental condition or purpose would be impossible of proof. This is not a question which inheres in the subject before us. The presence or absence of a criminal purpose may or may not be easily ascertained, but with that we now have nothing to do. Each prosecution under the act will have to depend upon its own proved facts. The existence or nonexistence of what is known in criminal law as the criminal mind would be a question for a trial jury under the facts established by the evidence submitted.

Questions are discussed in the brief of defendant which we have incidentally referred to, but without special attention, and which we scarcely think merit a further extension of this opinion.

We find nothing in the act under consideration requiring us to hold it unconstitutional. The district court

State v. Neble.

erred in holding the act of the legislature invalid.  The exceptions of the state are therefore

SUSTAINED.