BULOVA WATCH COMPANY, a New York Corporation, Appellant (Plaintiff below),

v.

ZALE JEWELRY COMPANY OF CHEY-ENNE, a Texas Corporation, Appellee (Defendant below).

OLIN MATHIESON CHEMICAL CORPO-RATION, a Virginia Corporation, Plaintiff,

v.

Claude E. BROWN and Mrs. Blanche Brown, d/b/a Claude Brown Sporting Goods Store, Defendants.

BULOVA WATCH COMPANY, a New York Corporation, Plaintiff,

v.

ZALE'S–CASPER, INC., a Texas Corporation, Defendant.

Nos. 3077, 3053, 3098.

Supreme Court of Wyoming.

May 8, 1962.

Louis A. Mankus, Cheyenne, for appellant.

A. Joseph Williams and Brooke Wunnicke, Cheyenne, for appellee.

Edward T. Lazear and Richard F. Pickett, of Loomis, Lazear & Wilson, Cheyenne, for plaintiff.

G. R. McConnell and Walter Scott, Laramie, for defendants.

Before BLUME, C. J., and PARKER, HARNSBERGER, and McINTYRE, JJ.

Mr. Justice HARNSBERGER delivered the opinion of the court.

In three separate actions consolidated for presentation to this court the constitutionality of Wyoming's Fair Trade Act is challenged.

The Act appears as Chapter 2, Title 40, §§ 40–8 to 40–17 inclusive, W.S.1957, and those of its provisions deemed important to this decision are as follows:

"§ 40–10. *Contracts fixing minimum sale or resale price authorized for commodities sold under trade-mark, brand name, etc.*—No contract relating to the sale or resale of a commodity which bears, or the label or container of which bears, the trade-mark, brand, or name of the producer or distributor of such commodity and which commodity is in free and open competition with commodities of the same general class produced or distributed by others shall be deemed in violation of any law of the State of Wyoming by reason of any of the following provisions which may be contained in such contract:

"(A) That the buyer will not resell such commodity at less than the minimum price stipulated by the seller.

"(B) That the buyer will require of any dealer to whom he may resell such commodity an agreement that he will not, in turn, resell at less than the minimum price stipulated by the seller.

"(C) That the seller will not sell such commodity:

"(1) to any wholesaler, unless such wholesaler will agree not to resell the same to any retailer unless the retailer will in turn agree not to resell the same except to consumers for use and at not less than the stipulated minimum price, and such wholesaler will likewise agree not to resell the same to any other wholesaler unless such other wholesaler will make the same agreement with any wholesaler or retailer to whom he may resell; or

"(2) to any retailer, unless the retailer will agree not to resell the same except to consumers for use and at not less than the stipulated minimum price. (Laws 1937, ch. 58, § 2; C.S. 1945, § 39–302.)"

"§ 40–11. *Acts deemed to be violations of contracts fixing minimum prices.*—For the purpose of preventing evasion of the resale price restrictions imposed in respect of any commodity by any contract entered into pursuant to the provisions of this act [§§ 40–8 to

40–17] (except to the extent authorized by the said contract):

"(A) The offering or giving of any article of value in connection with the sale of such commodity;

"(B) The offering or the making of any concession of any kind whatsoever (whether by the giving of coupons or otherwise) in connection with any such sale; or

"(C) The sale or offering for sale of such commodity in combination with any other commodity, shall be deemed a violation of such resale price restriction, for which the remedies prescribed by section 6 of this act [§ 40–14] shall be available. (Laws 1937, ch. 58, § 3; C.S. 1945, § 39–303.)"

"§ 40–12. *Who may establish minimum price.*—No minimum resale price shall be established for any commodity, under any contract entered into pursuant to the provisions of this act [§§ 40–8 to 40–17], by any person other than the owner of the trade-mark, brand or name used in connection with such commodity or a distributor specifically authorized to establish said price by the owner of such trade-mark, brand or name. (Laws 1937, ch. 58, § 4; C.S. 1945, § 39–304.)"

"§ 40–14. *Wilful violation of minimum price contract as unfair competition.*—Wilfully and knowingly advertising, offering for sale or selling any commodity at less than the price stipulated in any contract entered into pursuant to the provisions of this act [§§ 40–8 to 40–17], *whether the person so advertising, offering for sale or selling is or is not a party to such contract,* is unfair competition and is actionable at the suit of any person damaged thereby. (Laws 1937, ch. 58, § 6; C.S. 1945, § 39–306.)" (Emphasis supplied.)

This last section is generally referred to as the "nonsigner" provision.

In the interest of brevity, where reference is made to trade-mark, brand, name, et cetera, the single word trade-mark will be used and the single word producer will be used to include manufacturer or distributor where proper, and reference to the Fair Trade Act may be made by use of the single word Act.

The specific constitutional questions reserved to this court in case number 3098 are as follows:

"Question No. 1. Do the provisions of Section 40–8 to 40–17, Wyoming Statutes, 1957, violate Section 6, Article I, of the Constitution of the State of Wyoming?

"Question No. 2. Do the provisions of Section 40–8 to 40–17, Wyoming Statutes, 1957, violate Section 37, Article I of the Constitution of the State of Wyoming?

"Question No. 3. Do the provisions of Section 40–8 to 40–17, Wyoming Statutes, 1957, violate Section 1, Article II, of the Constitution of the State of Wyoming?

"Question No. 4. Do the provisions of Section 40–8 to 40–17, Wyoming Statutes, 1957, violate Section 1, Article III of the Constitution of the State of Wyoming?

"Question No. 5. Do the provisions of Section 40–8 to 40–17, Wyoming Statutes, 1957, violate Section 8, Article X of the Constitution of the State of Wyoming?"

In addition to these questions, in case number 3053 we are asked the following:

"1. Are Sections 40–8 through 40–17, Wyoming Statutes 1957 known as the 'Fair Trade Act', upon which the Complaint filed herein is based, in conflict with and in violation of Section 1 of the XIV Amendment to the Constitution of the United States, which provides: —'No state shall make or enforce any law which shall abridge the privileges and immunities of citizens of the United States; nor shall any state deprive any person of life, liberty or property, without due process of law; nor deny to any

person within its jurisdiction the equal protection of the laws'?

"2. Are Sections 40–8 through 40–17, Wyoming Statutes 1957 known as the 'Fair Trade Act' in conflict with and in violation of Section 7, Article I of the Constitution of the State of Wyoming, which provides that:—'Absolute, arbitrary power over the lives, liberty and property of freemen exists no where in a republic, not even in the largest majority'?

"4. Are Sections 40–8 through 40–17, Wyoming Statutes 1957 known as the 'Fair Trade Act' in conflict with and in violation of Section 30, Article I of the Constitution of the State of Wyoming, which provides that:—'Perpetuities and monopolies are contrary to the genius of a free state and shall not be allowed. Corporations being creatures of the state, endowed for the public good with a portion of its sovereign powers, must be subject to its control'?"

In the appeal taken in case number 3077, the State and Federal Constitutional provisions claimed to have been violated by the Fair Trade Act are: The due process portion of the Fourteenth Amendment of the Federal Constitution; the due process clause, Art. 1, § 6, Wyoming Constitution; Art. 1, § 37, Wyoming Constitution, making the Constitution of the United States the supreme law of the land; Art. 2, § 1, Wyoming Constitution, dividing powers of government into the distinctive departments of legislative, executive and judicial; and Art. 10, § 8, Wyoming Constitution, prohibiting consolidations and combinations of corporations of any kind whatever to prevent competition, to control or influence prices. Appellant also contended that the Act is an unlawful delegation of legislative power and therefore is violative of Art. 3, § 1, Wyoming Constitution, which vests legislative power in the legislature of this State, and that the Act is an arbitrary, improper and unreasonable exercise of police power without any substantial relation to the public health, safety or general welfare.

At the risk of being unnecessarily repetitious of what has been recounted in numerous opinions, we present a brief history of the development of Fair Trade Laws.

On July 2, 1890, the Congress enacted a law to protect trade and commerce against unlawful restraints and monopolies. This law is known as the Sherman Anti-Trust Act, 26 Stat. 209, 15 U.S.C.A. §§ 1–7. In 1911, the Federal court in Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502, held that price-fixing contracts between manufacturers and dealers were in restraint of trade. By further enactment of September 26, 1914, 38 Stat. 717, 15 U.S.C.A. § 41, Congress created a Federal Trade Commission, declaring in its section 5 (now 15 U.S.C.A. § 45(a)) that unfair methods of competition were unlawful. Thereafter on August 17, 1937, Congress, by what has become known as the Miller-Tydings Amendment, 50 Stat. 693, 15 U.S.C.A. § 1, legalized

"* * * contracts or agreements prescribing minimum prices for the resale of a commodity which bears, or the label or container of which bears, the trade mark, brand, or name of the producer or distributor of such commodity and which is in free and open competition with commodities of the same general class produced or distributed by others, when contracts or agreements of that description are lawful as applied to intrastate transactions, under any statute, law, or public policy now or hereafter in effect in any State, Territory, or the District of Columbia in which such resale is to be made, or to which the commodity is to be transported for such resale, * * *"

and declared

"* * * the making of such contracts or agreements shall not be an unfair method of competition under section 5, as amended and supplemented, of the Act entitled 'An Act to create a Federal Trade Commission [now 15 U.S.C.A. § 45]' * * *."

Antecedent to this permissive legislation, California, in 1931, had adopted a "Fair Trade Law", Cal.Stat.1931, c. 278, p. 583, which, however, did not contain any nonsigner provision, but in 1933, California added the nonsigner clause, Cal.Stat.1933, c. 260, p. 793, § 1, now appearing as § 16904, 5 West's Ann.Bus. & Prof.Code, pp. 102–103. This California law, as amended in 1933, became a pattern for Fair Trade Acts, although it was enacted before the Miller-Tydings Amendment, and it has been substantially followed in the forty-six states which at one time or another adopted Fair Trade laws.

After Schwegmann Bros. v. Calvert Distillers Corp., 5 Cir., 184 F.2d 11, reversed 341 U.S. 384, 71 S.Ct. 745, 95 L.Ed. 1035, 19 A.L.R.2d 1119, rehearing denied two cases, 341 U.S. 956, 71 S.Ct. 1011, 95 L.Ed. 1377, declared a Fair Trade law containing a nonsigner clause was in violation of the Sherman Anti-Trust Act, Congress, on July 14, 1952, amended the Sherman Anti-Trust Act so as to overcome the criticisms of the Schwegmann case and expressly permitted states to authorize contracts between parties which would be binding upon nonsigners. This amendment is usually referred to as the McGuire Act, 66 Stat. 632, 15 U.S.C.A. § 45.

The Wyoming Fair Trade Act is similar to or identical with provisions appearing in Fair Trade Acts adopted by forty-six states of the Union.

Seventeen of these states hold the Acts constitutional in the following cases: General Electric Company v. Telco Supply, 84 Ariz. 132, 325 P.2d 394 (1958); Everybody's Drug Co. v. Duckworth, 84 Ariz. 141, 325 P.2d 400 (1958); Max Factor & Co. v. Kunsman, 5 Cal.2d 446, 55 P.2d 177, affirmed Kunsman v. Max Factor & Co., 299 U.S. 198, 57 S.Ct. 147, 81 L.Ed. 122 (1936); General Electric Company v. Federal Employees' Distributing Company, 45 Cal.2d 891, 291 P.2d 942 (1956); Scovill Manufacturing Company v. Skaggs Pay Less Drug Stores, 45 Cal.2d 881, 291 P.2d 936 (1955); Burroughs Wellcome & Co. v.

Johnson Wholesale Perfume Co., 128 Conn. 596, 24 A.2d 841 (1942); Revere Copper & Brass, Inc. v. Economy Sales Company, D. C.Conn., 127 F.Supp. 739 (1954); National Pressure Cooker Co. v. Klein, 30 Del.Ch. 176, 57 A.2d 356, affirmed 31 Del.Ch. 459, 64 A.2d 529 (1949); General Electric Company v. Klein, 34 Del.Ch. 491, 106 A.2d 206 (1954); G. E. M. Sundries Company v. Johnson & Johnson, Inc., 9 Cir. (Hawaii), 283 F.2d 86 (1960); Seagram-Distillers Corp. v. Old Dearborn Distributing Co., 363 Ill. 610, 2 N.E.2d 940, affirmed Old Dearborn Distributing Co. v. Seagram-Distillers Corp., 299 U.S. 183, 57 S.Ct. 139, 81 L.Ed. 109, 106 A.L.R. 1476 (1936); Joseph Triner Corporation v. McNeil, 363 Ill. 559, 2 N.E.2d 929, 104 A.L.R. 1435, affirmed McNeil v. Joseph Triner Corporation, 299 U.S. 183, 57 S.Ct. 139, 81 L.Ed. 109, 106 A.L.R. 1476 (1936); Kinsey Distilling Sales Co. v. Foremost Liquor Stores, 15 Ill.2d 182, 154 N.E.2d 290 (1958); Goldsmith v. Mead Johnson & Co., 176 Md. 682, 7 A.2d 176, 125 A.L.R. 1339 (1939); Home Utilities Company v. Revere Copper and Brass, Inc., 209 Md. 610, 122 A.2d 109 (1956); General Electric Company v. Kimball Jewelers, Inc., 333 Mass. 665, 132 N.E.2d 652 (1956); W. A. Sheaffer Pen Co. v. Barrett, 209 Miss. 1, 45 So.2d 838 (1950); Corning Glass Works v. Max Dichter Co., 102 N.H. 505, 161 A.2d 569 (1960); Lionel Corp. v. Grayson-Robinson Stores, Inc., 27 N.J.Super. 54, 98 A.2d 623, affirmed in part and reversed in part 15 N.J. 191, 104 A.2d 304, appeal dismissed 348 U.S. 859, 75 S.Ct. 87, 99 L.Ed. 677 (1954); Bourjois Sales Corp. v. Dorfman, 273 N.Y. 167, 7 N.E.2d 30, 110 A.L.R. 1411 (1937); General Electric Co. v. Masters, Inc., 307 N.Y. 229, 120 N.E.2d 802 (1954); Ely Lilly & Co. v. Saunders, 216 N.C. 163, 4 S.E.2d 528, 125 A.L.R. 1308 (1939); Burche Co. v. General Electric Company, 382 Pa. 370, 115 A.2d 361 (1955); Miles Laboratories v. Owl Drug Co., 67 S.D. 523, 295 N.W. 292 (1940); Frankfort Distillers Corporation v. Liberto, 190 Tenn. 478, 230 S.W.2d 971 (1950); Weco Products Co. v. Reed Drug Co., 225 Wis. 474, 274 N.W. 426

(1937); Bulova Watch Co. v. Anderson, 270 Wis. 21, 70 N.W.2d 243 (1955).

Cases from twenty states holding the Acts unconstitutional are: Union. Carbide & Carbon Corporation v. White River Distributors, Inc., 224 Ark. 558, 275 S.W.2d 455 (1955); Olin Mathieson Chemical Corporation v. Francis, 134 Colo. 160, 301 P.2d 139 (1956); Liquor Store, Inc. v. Continental Distilling Corp., Fla., 40 So.2d 371 (1949); Seagram-Distillers Corp. v. Ben Greene, Inc., Fla., 54 So.2d 235 (1951); Miles Laboratories, Inc. v. Eckerd, Fla., 73 So.2d 680 (1954); Sterling Drug, Inc. v. Eckerd's of Tampa, Inc., Fla., 71 So.2d 156 (1954); Sunbeam Corporation v. Gilbert Simmons Associates, Fla., 91 So.2d 335 (1956); Cox v. General Electric Company, 211 Ga. 286, 85 S.E.2d 514 (1955); Bissell Carpet Sweeper Company v. Shane Co., 237 Ind. 188, 143 N.E.2d 415 (1957); Bulova Watch Company, Inc. v. Robinson Wholesale Co., Iowa, 108 N.W.2d 365 (1961); Quality Oil Company v. E. I. Du Pont De Nemours & Co., 182 Kan. 488, 322 P.2d 731 (1958); General Electric Company v. American Buyers Cooperative, Inc., Ky., 316 S.W.2d 354 (1958); Dr. G. H. Tichenor Antiseptic Co. v. Schwegmann Bros. Giant Super Markets, 231 La. 51, 90 So.2d 343, 60 A.L.R.2d 410 (1956); Shakespeare Co. v. Lippman's Tool Shop Sporting Goods Co., 334 Mich. 109, 54 N.W.2d 268 (1952); Argus Cameras, Inc. v. Hall of Distributors, 343 Mich. 54, 72 N.W.2d 152 (1955); Remington Arms Co. v. G. E. M. of St. Louis, Inc., 257 Minn. 562, 102 N.W.2d 528 (1960); Union Carbide & Carbon Corp. v. Skaggs Drug Center, Inc., Mont., 359 P.2d 644 (1961); Skaggs Drug Center v. General Electric Company, 63 N.M. 215, 315 P.2d 967 (1957); Union Carbide & Carbon Corp. v. Bargain Fair, Inc., 167 Ohio St. 182, 147 N.E.2d 481 (1958); American Home Products Corporation v. Homsey, Okl., 361 P.2d 297 (1961); General Electric Company v. Wahle, 207 Or. 302, 296 P.2d 635 (1956); Rogers-Kent, Inc. v. General Electric Company, 231 S.C. 636, 99 S.E.2d 665 (1957); General Electric Company v. Thrifty Sales, 5 Utah 2d 326, 301 P.2d 741 (1956); Remington Arms Company v. Skaggs, 55 Wash. 2d 1, 345 P.2d 1085 (1959); General Electric Company v. A. Dandy Appliance Co., 143 W.Va. 491, 103 S.E.2d 310 (1958).

Six states having Fair Trade laws which have not yet been attacked as being unconstitutional are: Alabama, Idaho, Maine, Nevada, North Dakota, and Rhode Island.

Four states without Fair Trade laws are: Alaska, Missouri, Texas, and Vermont.

Nebraska had a Fair Trade Act, but in McGraw Electric Company v. Lewis & Smith Drug Co., 159 Neb. 703, 68 N.W.2d 608 (1955), the Act was declared unconstitutional, whereupon the legislature repealed the law and now Nebraska is also without a Fair Trade Act.

In Virginia a resale price maintenance act, containing a nonsigner clause (its original Fair Trade Act) was held to be in conflict with a subsequent change made in the state's anti-monopoly law and, therefore, it was invalid. Benrus Watch Company v. Kirsch, 198 Va. 94, 92 S.E.2d 384, 388 (1956). But the court in the Benrus case stated:

> "* * * Whether the change [in the anti-monopoly act] proceeded from a purpose to make the Fair Trade Act inoperative is uncertain but not controlling, because that is its result whatever its purpose. * * *"

In view of this statement, it is unsound to assume that it was because of the nonsigner clause that the Act was found to be unconstitutional. On the other hand, the present Virginia Fair Trade Act, Title 59, c. 1, §§ 59–1 to 59–8, 1950 Code of Virginia, does not contain the usual nonsigner clause. In its stead there are what have been called "permissive" contractual provisions. This is reflected by the following excerpts from 9 Code of Virginia, § 59–8.2., 1960 Cum. Supp., p. 6:

> "(10) 'Contract' means any agreement, written or verbal, or actual notice imparted by mail or attached to the commodity or containers thereof.

"The acceptance of a commodity for resale, after notice imparted by mail or attached to the commodity or containers thereof, shall be prima facie evidence of actual notice of the terms of the 'contract'. Acceptance for resale with actual notice shall be deemed to be assent to the terms of the 'contract'. (1958, c. 259, § 2.)"

After the adoption of this statute, the Virginia court, in Standard Drug Co., Inc. v. General Electric Co., 202 Va. 367, 117 S.E.2d 289 (1960), dismissed 368 U.S. 4, 82 S.Ct. 16, 7 L.Ed.2d 16, concluded the new Act did not make mere notice of a contract with others a binding contract upon nonsigners, as seems to be the basic concept where nonsigner clauses are upheld, but that the new Act made the resale notice, appearing upon the commodity or its container, an *offer* of contract to the retailer, and made the acceptance and purchase of the commodity by the retailer the necessary assent to the terms of the offer, which completed a voluntarily assumed implied contractual obligation.

It has been suggested that this legislative characterization of the relationship between manufacturer or producer and a nonsigning retailer as an implied contract arising through offer and acceptance is insufficient to establish the transaction as binding the retailer. Such characterization amounts to nothing more than a legislative redefinition which still fails to remove the fatal defect of the lack of a voluntary obligation. In any event, the declaration by the Virginia court that the law which contained the nonsigner provision was unconstitutional, coupled with the failure of the legislature to include such a clause in the new Fair Trade Act, serves to eliminate Virginia from the list of states which have upheld the constitutionality of the nonsigner clause.

The confused situation surrounding Fair Trade laws is exemplified by what has occurred in Ohio. The 1936 Fair Trade Act of that state contained the usual nonsigner clause. Union Carbide & Carbon Corp. v. Bargain Fair, Inc., 167 Ohio St.

182, 147 N.E.2d 481, decided by the Supreme Court of that state, on January 22, 1958, unequivocally held the Act to be unconstitutional because it was an unlawful delegation of legislative power and discretion to private persons; because it transcended the police power of the state, and was unauthorized because unrelated to the public safety, morals, or general welfare; and because it contravened the due process provision of that state's Bill of Rights by arbitrarily and monopolistically denying a seller, who had not entered into any price-fixing contract with the manufacturer, the privilege of disposing of his own property on terms of his own choosing.

Following this decision, the Legislature of Ohio in 1959 enacted a new Fair Trade Act, patterned principally upon the late Virginia Act and its theory of offer and acceptance being an implied contract.

Then in the case of Helena Rubenstein, Inc. v. Cinti. Vitamin & Cosmetic Distributors Co., 167 N.E.2d 687, in the Court of Common Pleas of Ohio for Hamilton County, on May 23, 1960, the court held the new Fair Trade Act to be unconstitutional as an unlawful delegation of legislative powers to private persons. As far as we have been able to discover, the Rubenstein case was not appealed.

Thereafter, in Bulova Watch Company v. Ontario Store of Columbus, Ohio, 176 N.E.2d 527, the Court of Common Pleas of Ohio, Franklin County, on April 14, 1961, held the 1959 Fair Trade Law unconstitutional as a delegation of legislative power to private persons.

The last Ohio decision we have unearthed is Hudson Distributors, Inc. v. Upjohn Company and Hudson Distributors, Inc. v. Eli Lilly & Company, 176 N.E.2d 236, Court of Appeals of Ohio, Cuyahoga County, decided July 13, 1961, which held the 1959 Fair Trade Act constitutional and not an improper delegation of legislative power or otherwise, but with an impressive dissent by one of the appellate judges. As far as reported cases show, the Hudson case has not been appealed to the Supreme Court of

Ohio and hence it cannot be said that the new 1959 Fair Trade Act has been finally passed upon by the highest court of that state.

Hawaii is numbered among states holding these Acts constitutional. The decision in G. E. M. Sundries Company v. Johnson & Johnson, Inc., 9 Cir., 283 F.2d 86 (1960), was rendered after Hawaii became a state. Nevertheless, the case was brought while Hawaii was a territory and within Federal jurisdiction. It is, therefore, not entirely free from doubt but that the views of Hawaii's highest court, now that it is a state, may be more in accord with the views of the larger number of states which are holding Fair Trade Acts to be unconstitutional.

In any event, the pendulum of state decision has now definitely swung from the constitutional to the unconstitutional side. This numerical majority is not in itself conclusive of the matter, but it does seem to portend a change in judicial thinking and is justified by better reasoning and logic.

The focal point of the constitutional attack in the cases before us is § 40–14, W.S.1957, containing what is frequently referred to as a "nonsigner clause." The correct answer to its constitutionality is beclouded by the irreconcilable conflict of decisions rendered. Although the matter is before this court for the first time, uncertainty has already manifested itself in the different reactions of the trial judges before whom these three actions were brought. In case number 3053, Olin Mathieson Chemical Corporation v. Claude E. Brown and Mrs. Blanche Brown, d/b/a Claude Brown Sporting Goods Store, the court found there were difficult constitutional questions involved, and reserved those questions for decision by this court under authority of §§ 1–191 through 1–193, W.S.1957. In case number 3077, Bulova Watch Company v. Zale Jewelry Company of Cheyenne, the trial court gave judgment denying plaintiff the injunction it sought against the nonsigning defendant by virtue of § 40–14 of the Act, and de-clared that section unconstitutional. In case number 3098, Bulova Watch Company v. Zale's-Casper, Inc., the trial court also reserved the constitutional questions.

In giving our views respecting the nonsigner clause of Wyoming's Fair Trade Act, § 40–14, W.S.1957, we find it unnecessary to discuss the question of the Act's being violative of the Federal Constitution, or of our agreement or disagreement with the varying opinions expressed by either the majority or the dissenting members of the United States Supreme Court on this subject. It is sufficient to consider only the validity of the Act under the Wyoming Constitution, a question of which this court has complete jurisdiction and final authority. This is not intended to suggest that we be unmindful of the views of other courts, especially those grounded in sound reason and logic and based upon principles of law which have so borne the test of time and trial as to be firmly implanted in our system of jurisprudence. But we recognize that in the determination of that which is considered due process, proper exercise of police power and permissible delegation of legislative authority, "personal preference, not reason, seems, however, to be controlling" in many cases, and in many instances due process "is what the judges say it is; and it differs from judge to judge, from court to court". (Mr. Justice Douglas, dissent in Hannah v. Larche, 363 U.S. 420, 505, 506, 80 S.Ct. 1502, 1552, 4 L.Ed.2d 1307) This is evidenced, not only by the disparity between the decisions of the various courts of our country regarding these questions, but more especially by the changing positions courts of the same jurisdiction have taken from time to time.

Many of the enunciations of our learned Chief Justice, in his masterful opinion in State v. Langley, 53 Wyo. 332, 84 P.2d 767, are apropos of some of the questions to be decided here, and are precepts which we are unwilling to disturb.

The question before the court in the Langley case was the constitutionality of

Ch. 73, § 2, S.L. of Wyoming, 1937, which now appears as § 40-24, W.S.1957, and is a part of our anti-discrimination laws.

 Among these pronouncements the court held: That police power is an attribute of sovereignty inherent in the State's legislative body unless expressly limited by Constitution; that the due process clause of our Constitution has a substantive aspect which definitely limits police power; that a law will not be declared unconstitutional unless clearly so; that even though police power is an attribute of sovereignty essential to civilized government and inherent in the legislative body, the means adopted for its exercise must be reasonable and designed to accomplish the end in view; that the purposes for which the police power is invoked must have relation to the public weal, must be within the scope and in furtherance of that power, and the means adopted must be reasonable and appropriate for the accomplishment of and have a substantial connection with the end in view; that under its police power the legislature may provide for the general economic welfare of the people and decide whether free and unlimited competition shall prevail; that courts, employing a standard of reasonableness as applied to the facts, are the final arbiters as to whether the law is an unwarranted invasion of rights guaranteed by the Constitution; and that generally the use of property and the making of contracts shall be free of governmental interference, but neither property rights nor contract rights are absolute.

The opinion also points out at 84 P.2d 770 that Art. 1, § 6, Wyoming Constitution, "does not state that 'no person shall be deprived of life, liberty or property,' but states that no person shall be deprived thereof 'without due process of law.'"

However, at 84 P.2d 771, the opinion takes issue with the philosophy that the legislature may forbid or restrict any business if it has a sufficient force of public opinion behind it, calling attention to Art. 1, § 7, Wyoming Constitution, which says:

"Absolute, arbitrary power over the lives, liberty and property of freemen exists nowhere in a republic, not even in the largest majority."

 Article 1, § 6, Wyoming Constitution, requires that lawful process be employed before a person is deprived of life, liberty or property. The liberty envisioned is not alone a liberty of person such as is offended by enslavement, imprisonment or other restraint. It contemplates a person's liberty to do all that is not made unlawful. Hence, persons are at liberty to make lawful contracts. Equally, persons are at liberty to refrain from making contracts. And a prime requisite of contract obligation is that the undertaking is voluntarily assumed and not occasioned by fraud, duress or any form of compulsion, governmental as well as private. Voluntary engagement by contract entails the contractual assumption of a binding obligation as opposed to an obligation imposed by law.

Furthermore, we cannot unqualifiedly accept the Virginia theory that an implied offer of contract is made by the producer when he affixes on or to a commodity a notice that it is to be resold at a price certain, or that the purchase of such a marked item is an implied acceptance of that offer which completes or gives rise to an implied contract between the producer and all subsequent buyers. Even if the producer may expressly or by such implication, make a price-fixing contract with the purchaser to whom the producer sells the article, in order to imply there is a continuing offer of contract by the producer to other buyers, down through all intermediate channels of trade until the commodity reaches the ultimate consumer, it must be assumed the producer has retained the title to the commodity itself, as well as title to its trade-mark. Otherwise the producer would be without any right to cumber such future transfers of the article.

A legislative act which purports to burden a person with a contractual covenant

agreed to by private parties or private interests, but not agreed to by the non-signing retailer, violates that person's liberty not to so contract if he elects and robs that person of his liberty without due process. The legislature may not impress contractual duties which have been voluntarily assumed by others as the contractual duty of a person not a party to such contracts. This is more especially true where the terms of the contracts are ordained and dictated by the selfish interests of private persons, primarily for their benefit, and are adverse and antagonistic to the interest and desire of the nonsigner who is here sought to be controlled against his will.

Article 1, § 37, Wyoming Constitution, recognizes the Federal Constitution as the supreme law of the land. Its cogency in this case is found in the due process provisions of the Fourteenth Amendment which it will not be necessary to separately discuss.

Article 2, § 1, Wyoming Constitution, vests the State's government in three distinct departments—the legislative, executive and judicial. This needs no present comment, as the legislative function will be dealt with in the following.

Article 3, § 1, Wyoming Constitution, vests legislative power in the State's legislature. This provision is invoked under the claim that the Act is an unlawful delegation to private parties of that legislative power and without any safeguards for the protection of the public. Even though the legislature be empowered to impress merchandising with a limitation intended to prevent discrimination and tortious competition, such a power can only be exercised by the legislature itself.

There is a clear distinction between the power to legislate and the right to regulate. The former is vested exclusively in the legislature by constitutional edict. The latter is sometimes granted public authorities by legislative sanction. The former ordains the law. The latter merely prescribes means and methods for its application.

The criticized Act only permits the making of certain price-fixing contracts which were formerly considered to be in violation of the Sherman Anti-Trust Act. This legislation does not establish prices at which products may be lawfully retailed, nor does it prescribe a formula by which such prices may be determined, as do our anti-discrimination laws, §§ 40–18 to 40–40 inclusive, W.S.1957. The Act leaves to the uncontrolled and uncertain discretion, option and whim of private parties the determination of a retail price suitable to their own interests and for their private benefit, without any regard for the welfare of the public and in derogation of the public's right to a voice in the matter or even to be represented by any public authority interested in the people's behalf. By the passage and approval of the Fair Trade Act, no sale price of any commodity was made unlawful or restrainable. When the legislature had completed its law-making effort, no one could have been prosecuted or restrained because of this new enactment. It is only after the legislative power of this State had been fully exercised and exhausted that it is left to private interests, at their choice, to step in and by their unsupervised, independent, supplemental and selfish action make unlawful and restrainable that which was until then entirely lawful and not subject to judicial restraint. If such legislative delegation of law-making power is permitted, that body may at will abdicate all its law-making prerogatives and pass on the entire law-making power of our State to special private interests. We have found no better way to condemn such legislation than the words of the court in Yick Wo v. Hopkins, 118 U.S. 356, 370, 6 S.Ct. 1064, 1071, 30 L.Ed. 220:

"* * * the very idea that one man may be compelled to hold his life, or the means of living, or any material right essential to the enjoyment of life, at the mere will of another, seems

to be intolerable in any country where freedom prevails, as being the essence of slavery itself."

This pronouncement was quoted in State v. Langley, 53 Wyo. 332, 84 P.2d 767, 776, in support of its holding in that case, and was used in the Nebraska decision in State v. Drayton, 82 Neb. 254, 117 N.W. 768, 23 L.R.A.,N.S., 1287, 130 Am.St.Rep. 671, and quoted approvingly in Powell v. Pennsylvania, 127 U.S. 678, 685, 8 S.Ct. 992, 996, 32 L.Ed. 253.

While in State v. Langley, supra, where the above statement was used by our court, the constitutionality of our anti-discrimination law was upheld, the force of the statement is enhanced because it is a two-edged sword that cuts both ways: On the one hand to uphold the constitutionality of a good law, but to strike down as unconstitutional a bad law.

The disposition of the judicial branch of government has always been to scrupulously refrain from encroaching in the slightest way into the legislative field of policy making where factual or economic factors require latitude of discretion. We will not and we do not substitute our opinions in such matters for the considered judgment of our lawmakers. Yet, we ourselves have a function to perform, a constitutional right, and the paramount duty to insist that the legislature not renounce its legislative power by any such attempt to delegate it away. We approached the limit of judicial tolerance in upholding legislative fiat in the so-called trading stamp matter, Steffey v. City of Casper, Wyo., 357 P.2d 456 (1960), rehearing 358 P.2d 951 (1961). We conceded the legislative right to directly prohibit a sales practice which that body evidently deemed was inimical to public welfare. What we cannot approve of here is the attempt to delegate to others the legislative right to prohibit.

Aside from the improper delegation of legislative power are the further questions of the reasonableness of the law and whether it is an unwarranted invasion of the

rights guaranteed by our Constitution. We have heretofore acknowledged that, notwithstanding, property rights and the right to make contracts should be free from governmental interference, still these rights are not absolute. This, of course, means the sovereign may, in proper circumstance, limit the exercise of these rights. When, however, governmental limitation is attempted by giving unto private interests the right to prescribe conditions of use, sale and contract respecting a person's property, such legislation is so grossly unconscionable that courts, as the final arbiters of its reasonableness, must hold the law an unwarranted invasion of the private liberty and property guaranteed by the Constitution of this State.

The police power of the legislature is great indeed. Its exercise in the protection and preservation of the public safety, its health, its morals, and in behalf of its general welfare is not merely laudable, it is essential. But however great its power, it is nonetheless not beyond limitation. Even if it be agreed that the philosophy behind the enactment of this law brings it within the long-range welfare of the public by assisting in the preservation of certain businesses which can no longer continue to exist without governmental subsidy and the supposed protection accorded by the Act, still the means adopted to accomplish the purpose must provide a legal process by which to infringe the liberty or the property of persons affected. What day in court is given them? To what authority, board, officer, tribunal or court may such persons make representations in their own interest or behalf before the sale price is fixed? It would be bad enough if such a price-fixing formula were accomplished through some public official acting without hearings, but the price-fixing method prescribed by the Act is without even that vestige of due process.

Article 10, § 8, Wyoming Constitution, expressly prohibits the *consolidation* or *combination* of corporations to prevent competition, *to control or influence produc-*

*tions or prices,* or to in any manner interfere with the public good or general welfare.

The language of this constitutional prohibition leaves in doubt the meaning which our constitutional framers intended should be given the emphasized words. Notwithstanding, it seems plain they sought some restriction on corporations controlling or influencing prices. The Fair Trade Act is so designed as to permit a single corporation, as well as a single individual, acting with either another corporation or another individual, to control and influence prices. Even though the control and influence are limited to the producer's own product, these nevertheless go beyond the manufacturer's right to sell or not to sell at a price of its own choosing, and admit of a corporate producer combining with a corporate retailer to control and influence the price of a trade-marked article through all channels of intermediate trade, clear down to the ultimate consumer. It puzzles to understand how this should be interpreted as being other than a prohibited control or influence of prices and a limitation of free, open and competitive marketing in derogation of the right and welfare of the public to enjoy the fruits of such free enterprise. Although we will not at this time hold the Act is violative of the express prohibition of this constitutional provision, it is certainly out of harmony with its spirit, and, in its application to corporate bodies, its so-called "horizontal" price fixing brings it close to contravening Art. 10, § 8, of our Constitution. Whether actually unconstitutional or not, the Act unquestionably furnishes a device by which retailers may combine with producers to fix prices, using the producer as an intermediary and thus by indirection accomplish that which is undesirable. However, because the wording of the constitutional provision is uncertain, we cannot say that the Act is clearly violative of its provision.

Many courts, both state and federal, some of which have been cited herein, holding Fair Trade Acts constitutional, do so on the theory that when the producer sells a trade-marked commodity it does not sell its trade-mark but retains under separate title the ownership of the trade-mark.

It would seem to be an unjustifiable, untenable and somewhat absurd legal fiction to say that by simply inscribing his trade-mark upon, attaching it to, or accompanying it with an article a producer obtains or retains a divisible and separate title to the trade-mark which does not pass with the marketing and delivery of the commodity itself to the buyer. When a producer elects to identify his product with a trade-mark and launches it into the marts of trade, he has created and sold an entity—a unit—an integrated article—which its purchaser is not required to destroy or deface in order to lawfully market it at a price suitable to him, provided only that he has not offended anti-discrimination laws. If the producer does not want to sell the product bearing his trade-mark, it is his privilege to refrain from so doing. And when he does so identify his product, he is privileged to determine the price which he is willing to accept for it as a trade-marked commodity. He may fix one price for the article with his trade-mark and accept a different price for an identical article not bearing his trade-mark. In either case he sells that which he wants to sell and obtains the price he asks for what he sells. However, the commodity he sells embodies the entire article, including whatever he has added to it, or placed upon it, or which accompanies it. He has been paid the full price demanded by him. When such a sale is made, the seller gives into the buyer's possession everything which he has placed upon or with the object of sale. He retains no part of it. If there is any merit at all in the theory of continuing separate identity and ownership of the trade-mark as distinguished from the article itself, a simple answer is that by affixing to or accompanying with the object of sale the owner's trade-mark, and placing the commodity thus identified upon the market, the producer or distributor has offered and sold

all his interest in that portion of his trademark which he placed in use upon or with the article sold, and in so doing has consented to its continued use by all purchasers.

■ From what has been said, it should be clear that the Wyoming Fair Trade Act is unconstitutional as an improper delegation of legislative power, as offending the required due process protection, and as being beyond the police power of the State.

We, therefore, answer the submitted questions as follows:

Question No. 1. The provisions of §§ 40–8 to 40–17, W.S.1957, violate Art. 1, § 6, of the Constitution of the State of Wyoming.

Question No. 2. The provisions of §§ 40–8 to 40–17, W.S.1957, violate Art. 1, § 37, of the Constitution of the State of Wyoming.

Question No. 3. The provisions of §§ 40–8 to 40–17, W.S.1957, violate Art. 2, § 1, of the Constitution of the State of Wyoming.

Question No. 4. The provisions of §§ 40–8 to 40–17, W.S.1957, violate Art. 3, § 1, of the Constitution of the State of Wyoming.

Question No. 5. The provisions of §§ 40–8 to 40–17, W.S.1957, do not violate Art. 10, § 8, of the Constitution of the State of Wyoming.

In answer to the additional questions submitted in case number 3053:

1. Sections 40–8 through 40–17, W.S. 1957, known as the Fair Trade Act, are in conflict with and in violation of that portion of Section 1 of the XIV Amendment to the Constitution of the United States, which relates to due process and the equal protection of laws.

2. Sections 40–8 through 40–17, W.S. 1957, known as the Fair Trade Act, are in conflict with and in violation of Section 7, Article I, of the Constitution of the State of Wyoming.

4. Sections 40–8 through 40–17, W.S. 1957, known as the Fair Trade Act, are not in conflict with and are not in violation of Section 30, Article I, of the Constitution of the State of Wyoming.

The judgment of the district court in case number 3077 is affirmed.

In Case Number 3077, affirmed.

In Case Number 3098 and Case Number 3053, questions answered.